428 A.2d 1366

Jacqueline B. MASON, Appellant,

v.

WESTERN PENNSYLVANIA HOSPITAL, a Corporation, and Robert Blockstein, M. D.

Superior Court of Pennsylvania.

Argued Dec. 3, 1980.

Filed April 16, 1981.

Petition for Allowance of Appeal Granted Aug. 24, 1981.

Byrd R. Brown, Pittsburgh, for appellant.

Nora Fischer, Pittsburgh, for Western Pennsylvania Hospital, appellee.

Richard S. Dorfzaun, Pittsburgh, for Blockstein, appellee.

Before CERCONE, President Judge, and PRICE, SPAETH, HESTER, CAVANAUGH, BROSKY, and HOFFMAN, JJ.

CAVANAUGH, Judge:

This is an appeal by the plaintiff-mother (appellant) from an order of the court below sustaining defendants' (appellees) demurrer to plaintiff's complaint for recovery of damages for the wrongful birth of appellant's child. A baby was born to appellant on January 2, 1977 despite the fact that a tubal ligation had been performed on the appellant on June 11, 1974 by defendant Dr. Blockstein at defendant hospital. Appellant's complaint was based on two causes of action: (1) that defendants breached their express and implied warranties that the sterilization procedure which appellant underwent would prevent future pregnancy, and (2) that defendants were negligent in performing the tubal ligation upon appellant. Appellant sought damages for mental anguish, pain and suffering and inconvenience resulting from the pregnancy and subsequent caesarian section; medical costs and expenses for delivery of the child; and expenses for support and maintenance of the child.

The lower court held that it is against the public policy of this state to recognize claims in trespass or assumpsit for the birth of a child. However, subsequent to the lower court's decision, this court has held to the contrary in *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496 (1979), allocatur granted December 18, 1979, and *Stribling v. deQuevedo*, —— Pa.Super. ——, 432 A.2d 239 (1980).

In *Speck*, a child was born following unsuccessful vasectomy and abortion attempts. The infant suffers from neurofibromatosis, a crippling disease of the nervous system. The parents did not want a child and took measures to prevent conception and birth because of their deep-rooted fear that such a child would be born with this hereditary disease. The child's father and the child's two sisters also suffer from neurofibromatosis.

Mr. and Mrs. Speck brought suit on behalf of the child for "wrongful life" and in their own right for pecuniary expenses they had borne and would bear for the care and treatment of the infant and also seeking to recover for emotional, mental and physical injuries and expenses suffered by them as parents as a result of the birth of their child. Although we denied the infant's claim for wrongful birth, we allowed the parents' claim, stating:

> Here there is no dispute the pleadings allege the existence of a duty flowing from the defendant-physicians to themselves, the breach of which resulted in the birth of Francine. The alleged negligence and misrepresentations of both doctors and by the alleged breach of contract by Dr. Finegold has also been adequately pleaded. Unlike Francine's claim based on "wrongful life," plaintiff-parents' causes of action allege in traditional tort language that but for defendants' breach of duty to properly treat and advise plaintiff-parents they would have not been required to undergo the expenditures alleged. In these allegations plaintiff-parents set forth a duty owed to them by the doctors and breached by the doctors with resulting injuries to the plaintiffs.

Thus, *Speck* established that parents have a cognizable cause of action for damages they have borne and would bear for the care and treatment of a child born following negligently performed sterilization procedures.

■ Therefore, in the case before us we must determine whether, accepting as true all relevant facts sufficiently pleaded in the complaint and all inferences fairly deducible therefrom, the plaintiff's complaint sets forth a cause of

action. *See Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105 (1975); *Pike County Hotels Corp. v. Kiefer*, 262 Pa.Super. 126, 396 A.2d 677 (1978). First, we address appellant's claim of negligence in the performance of the tubal ligation. Because the appellant alleges a duty on the part of appellees, the breach of that duty by appellees, which breach proximately caused the damages suffered by the injured parties, a cognizable cause of action has been alleged. Restatement of Torts (Second) § 281. We therefore overrule the granting of the demurrer by the court below as to the alleged negligence of appellees.

The lower court also granted a demurrer as to appellant's claim of breach of warranty by the appellees. In her complaint, Mrs. Mason alleges as to both Western Pennsylvania Hospital and Dr. Blockstein that on or about June 11, 1974, a contract arose "whereby defendant promised, warranted and agreed to perform a bilateral tubal ligation upon plaintiff and defendant warranted that said bilateral tubal ligation would prevent future pregnancy."

In the absence of a special contract, a physician is neither a warrantor of a cure, nor a guarantor of the result of his treatment. *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968); *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167 (1963); *Carl v. Matzko*, 213 Pa.Super. 446, 249 A.2d 808 (1968). The physician is not expected to guaranty a good result from the course of treatment recommended or administered. *Ragan v. Steen*, 229 Pa.Super. 515, 331 A.2d 724 (1974), *see also McCandless v. McWha*, 22 Pa. 261 (1853) (no implied "warranty of cure" in Pennsylvania). A physician, however, may bind himself by an express contract to obtain specific results by treatment or an operation. Consideration for this guaranty must be shown. 61 Am.Jur.2d, Physician, Surgeons and Other Healers, § 149 at 279.[1] A special contract where-

1. Although we have found no case where an appellate court of this jurisdiction has held an express warranty was made by a physician, it is generally held that an alleged express warranty cannot be enforced unless, (1) it was made before the operation was performed, and was relied upon by the patient in contracting for the service, or, (2) it was supported by a separate consideration. *See Sard v. Hardy,*

by a physician warranted a particular result was held to exist in the case of *Shaheen v. Knight*, 11 Pa. D. & C.2d 41 (1957). In *Shaheen* a patient alleged that his physician had breached a contract to sterilize him, which breach resulted in the birth of his fifth child. The court rejected the physician's "implied warranty of cure" argument in holding that the patient was suing under a special contract by which the physician agreed to make him "immediately and permanently sterile and guaranteed the results thereof." [2] The court stated:

> A doctor and his patient . . . are at liberty to contract for a particular result. If that result be not attained, the patient has a cause of action for breach of contract. The cause of action is entirely separate from malpractice, even though both arise out of the same transaction. The two causes of action are dissimilar as to theory, proof and damages recoverable.

11 Pa. D. & C.2d at 44. Because Mrs. Mason in her complaint alleges an express warranty, supported by consideration, that the operation would result in sterility, a cause of action for breach of contract has been sufficiently set forth. Therefore, the lower court erred in granting defendant's demurrer as to this claim of an express warranty.

Appellees argue that this case is distinguishable from *Speck* and *Stribling* in that the baby born to Mrs. Mason is normal and healthy.[3] The Speck infant suffers from neurofibromatosis and the Stribling infant was born with dextrocardia, a condition in which one's heart is farther to the

34 Md.App. 217, 367 A.2d 525, reversed 281 Md. 432, 379 A.2d 1014 (1976); annot. 43 A.L.R.3d 1221, Contract to Effect Specific Medical Result; *see also* annot. 27 A.L.R. 1250, Physicians and Surgeons—Warranty of Success.

**2.** The court ultimately held that damages for the breach of contract, measured by the expense of rearing and educating the child born subsequent to the negligent sterilization, are not allowed due to public policy.

**3.** In her complaint appellant does not allege that the infant was defective in any way. Thus we may properly infer that the baby is normal and healthy.

right than is normal. However, our decisions in *Speck* and *Stribling* provide no such basis for distinguishing these cases.

After carefully reviewing our decisions in *Speck* and *Stribling*, we find that the negligence of the physician and not the physical condition of the infant is at the crux of the matter. As we stated in *Speck* :

> It is not contended by plaintiffs that defendant-physician's treatment of Mr. Speck in the sterilization procedure caused the abnormalities in their infant. But only that had plaintiffs been properly treated and cared for, their child would not have been conceived or born or if they had been sufficiently advised of the possibility of failed sterilization procedures they could have terminated the pregnancy within a prescribed time period by alternative methods of relief.

408 A.2d at 507. Thus, the cause of action we recognized in our holding in *Speck* is not based on the fact of the infant's ill health but on the breach of defendant-physician's duty and the resulting injuries to the plaintiffs.

As we stated in *Speck*, the question in determining whether a cause of action exists is not the worth and sanctity of life, but whether doctors were negligent in their surgical attempts at sterilization. 268 Pa.Super. at 355, 408 A.2d at 503. The parents in this case decided for socio-economic reasons [4] to bear no more children.[5] To achieve this end Mrs.

4. In *Speck* we noted various purposes in limiting the size of a family: (1) eugenic (preventing birth of a defective child); (2) therapeutic (preventing harm to mother's health or life); (3) socio-economic or contraceptive (economic reasons). 268 Pa.Super. at 348 n.4; 408 A.2d at 499 n.4. However, despite different labels, the elements of the cause of action are the same. *But see* n.4, *supra*, for situation where purpose of contraception may be relevant.

5. In his concurring and dissenting opinion in *Speck*, Judge Spaeth made the following observation which is pertinent to the instant case:

> I should leave undecided the outcome in a case in which a child that resulted from the defendant's negligence had been unwanted because its birth presented a risk that in the end did not materialize. For example, it might be that a couple desired no more

Mason underwent a tubal ligation. She alleges, following the birth of her child, that the operation was negligently performed and that she was injured thereby. Thus she has sufficiently set forth a cognizable cause of action.

We now turn to the issue of damages. In *Speck* and *Stribling* this court recognized the parents' right to recover for the costs of rearing the child and medical damages pertaining to the child's condition together with claimed medical, mental, emotional and physical pain and suffering caused by the operations. In view of this, the question before us is whether following the birth of a normal and healthy child the right to recover these damages exists.

Some jurisdictions deny recovery for the birth of a normal child on public policy grounds. *See, e. g., Rieck v. Medical Protective Company,* 64 Wis.2d 514, 219 N.W.2d 242 (1974). In *Rieck v. Medical Protective Company, supra,* it was stated that to hold that the complaint set forth a cause of action for recoverable damages "would open the way for fraudulent claims and would enter a field that has no sensible or just stopping point." 64 Wis.2d at 519, 219 N.W.2d at 244. A later Wisconsin case, *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975), allowed damages to parents of a deformed child born following a negligently performed vasectomy. The court, however, limited damages to those attributable to deformities of the child excluding expenses otherwise involved in rearing a normal child. The court stated:

> *Rieck* must be distinguished from the case at hand because the parents there sought to recover the entire expense of raising a normal, healthy but claimed unwanted child during its dependency. Here the parents sue only for the expense occasioned by the congenital defects.

children because they feared a risk to the mother's health in childbirth, or, as here, a hereditary disease. If a child was because of the defendant's negligence nevertheless born, but with no damage to the mother's health and itself healthy, arguably the damages should not include the expenses of raising the child. Cf. *Wilczynski v. Goodman,* 73 Ill.App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979).

268 Pa.Super. at 374 n.6, 408 A.2d at 513 n.6.

69 Wis.2d 766, 233 N.W.2d at 376. *See also Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975) where the court allowed recovery for costs reasonably related to the child's physical defects but excluded expenses to be incurred in rearing the child.

In light of *Speck* a distinction similar to that made by the *Dumer* court is not possible. In *Speck* this court did not limit the damages recoverable to those related to the child's illness but also allowed damages for expenses of rearing the child that would have been incurred were she normal and healthy. Thus it would be inconsistent to hold that parents of a deformed or diseased child may recover *all* expenses arising from the tortious conduct while not permitting any recovery for parents of a normal child given that the child in both cases is unwanted. As noted earlier this court in *Speck* stated that the issue is not the worth and sanctity of life, but the negligence of the physicians, and that a recovery of money would not be against public policy. 268 Pa.Super. at 355, 408 A.2d at 503. "Once the plaintiff has carried [the burden of proving negligence], it is axiomatic that the tort-feasor is liable for all damages which ordinarily and in the natural course of things have resulted from the commission of the tort." 268 Pa.Super. at 364, 408 A.2d at 508. Therefore, because of our disposition in *Speck*, we find no basis for distinguishing the "wrongful but healthy life" from the situations in *Speck* and *Stribling* in terms of entitlement to damages.

However, in determining the extent of damages recoverable we are faced with the question whether damages are to be reduced by the application of the "benefit rule," Restatement of Torts (Second), § 920. The benefit rule provides:

When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.

Thus the value of a child's aid, comfort and society during the parents' life expectancy is to be considered as offsetting the cost of rearing the unplanned child. *See Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977).

Although President Judge Cercone discusses § 920 at length in the *Speck* opinion, he does not specifically decide whether the rule is to be applied, nor was it necessary to the holding in *Speck* to decide the issue. Nevertheless, we hold that the benefit rule in limiting damages will prevent a windfall to the parents and an undue financial burden being placed on the physician. Moreover, as this court noted in *Speck*, courts which have allowed recovery by parents for damages proximately caused by the physician's negligence, including the costs of rearing a healthy child, have ordinarily applied the benefit rule. *See, e. g., Sherlock v. Stillwater Clinic, supra*, and *Anonymous v. Hospital*, 33 Conn.Sup. 126, 366 A.2d 204 (1976) (both involving negligently performed sterilization); *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971) (pharmacist misfilled prescription for oral contraceptive).

In a negligent sterilization case the Connecticut Superior Court stated:

> The safer course in situations similar to the present case would appear to be to allow the allegations of the complaint to stand and to permit the defendants to argue in mitigation of damages the satisfaction, joy, and companionship, which normal parents receive in the rearing of a child and which make economic loss worthwhile. Although the specific ascertainment of damages in that area is difficult, that should not prevent their consideration by the trier of fact.

*Anonymous v. Hospital, supra*, 366 A.2d at 206. We agree. Thus, the jury may reduce the damages "by an amount representing the benefit that a child—healthy or unhealthy—would bring to the parents" (footnote omitted) *Speck, supra*, 268 Pa.Super. 374, 408 A.2d at 513 (Spaeth, J., concurring and dissenting). The damages recoverable, then, in a "wrongful but healthy life" case may be reduced due to the

application of the benefit rule. It is also conceivable that the expenditure in rearing a mentally or physically defective child may not be offset by the child's aid, comfort and society to the extent that expenses relating to a normal and healthy child may be offset thereby. However, any such determination as to the amount recoverable is within the province of the jury. In terms of entitlement to damages, as set forth above, no principled distinction can be made between the normal unwanted child and the physically or mentally impaired unwanted child.

Thus Mrs. Mason's claims for damages due to pecuniary expenses in prenatal and postnatal care, as well as expenses relating to the rearing of the child, as offset by § 920, are allowable. Likewise, damages resulting from Mrs. Mason's loss of earnings, physical pain and suffering and emotional distress incident to the negligent surgery are recoverable if proven. As we held in *Speck* and *Stribling*, however, damages arising from emotional and mental distress incident to the birth and rearing of the child are not recoverable. Although our discussion of such damages specifically addressed the problem of determining a legal realm of accountability for the pain and suffering of parents of mentally or physically deficient children, our conclusion is nonetheless applicable in the case of a normal child. In disallowing the Specks damages this court stated:

> ... our position is that all parents suffer some degree of stress, especially if a child is born with a disabling condition. However, not all of these children are "unwanted" in any sense of that term, and the emotional anguish that they suffer may be a normal, uncomprehensible price one pays for being a parent. Therefore, to allow plaintiffs' claim for mental and emotional stress would be to give them a societal advantage not conceivable in other cases of parenthood.

268 Pa.Super. at 367, 408 A.2d at 509. In view of this reasoning, the parents of a normal, healthy child should not be given a societal advantage over other parents of such

children. Mrs. Mason's claim for mental distress must be denied.[6]

The order of the lower court is reversed and the case remanded for proceedings consistent with this opinion.

Reversed and remanded.

BROSKY, J., files a concurring opinion.

SPAETH, J., files a concurring and dissenting opinion.

HESTER, J., files a concurring and dissenting opinion, in which CERCONE, President Judge, and HOFFMAN, J., join.

PRICE, J., files a dissenting opinion.

BROSKY, Judge, concurring:

I share the view of the majority but strongly believe the application of the Benefit Rule is susceptible to discernable guidelines aiding the trier of fact in its determination.[1] I believe that our recognition of a cause of action for wrongful birth of a "normal" child requires us to recognize the existence of damages that accompany the tort claim.[2] I do not hold with the rationale that these damages are too speculative.[3] I agree with the court in *Custodio v. Bauer*, 251 Cal.App.2d 303, 59 Cal.Rptr. 463, 27 A.L.R.3d 884 (1967), that the birth of a healthy child does not necessarily mean the plaintiffs have not suffered an injury compensable by damages.

It appears to me that our analysis must begin with the well established principle of tort law that:

6. In her complaint Mrs. Mason also alleges damages on behalf of her other two children, both minors, resulting from the birth of her third child. We do not address this claim, however, since the two minor children are not parties to this action.

1. Restatement of Torts § 920.

2. Contra: *Rieck v. Medical Protective Co.*, 64 Wis.2d 514, 219 N.W.2d 242 (1974).

3. For a discussion of this view, see 13 Val.L.R. 129 (1978).

[i]t is fundamental to our common law system that one may seek redress for every substantial wrong. The best statement of the rule is that a wrongdoer is responsible for the natural and proximate consequence of his misconduct.

*Niederman v. Brodsky,* 436 Pa. 401, 403, 261 A.2d 84, 85 (1970). Thus, under ordinary tort principles, damages must be awarded with the intent to right a wrong.

Damages generally should be awarded within bounded areas, for it is true that an unlimited scope of damages would bring into being speculative claims, which our society could not afford. This public policy was best articulated by Justice Andrews in his landmark dissent in *Palsgraf v. Long Island R. R.,* 248 N.Y. 339, 162 N.E. 99 (1928), wherein he stated the policy behind our court's decision only to award damages which are proximately related to an injury:

What we mean by the word "proximate" is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics.

Id. at 352, 162 N.E. at 103.

One rationale holds that the damages in wrongful birth actions, though they are proximately caused by the defendant's acts, must be limited to the damages directly related to the cost of pregnancy because damages resulting from rearing the child are too speculative. However, clearly the damages in the instant case are no more speculative than those found in wrongful death cases.

Notably, in our Supreme Court's opinion of *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979), damages were awarded for the wrongful death of a child struck by an automobile and, also, for the mental trauma suffered by a bystander. I cannot see how the damages sought in the instant case are more speculative than those generally brought in wrongful death cases, damages sought by a bereaved spouse claiming loss of companionship, society, love and affection, comfort, sexual relations, or other intangible damages in the broad

term "conjugal rights." See generally: *Measure and Elements of Damages in Wife's Action for Loss of Consortium*, 74 A.L.R.3d 805; *DeMarines v. KLM Royal Dutch Airlines*, 433 F.Supp. 1047 (D.C.Pa.1977); *Hopkins v. Blanco*, 457 Pa. 90, 320 A.2d 139 (1974); *Gates v. Foley*, 247 So.2d 40 (Fla.1971); *Dini v. Naiditch*, 20 Ill.2d 406, 170 N.E.2d 881, 86 A.L.R.2d 1184 (1960). It is well accepted that: "Basing the denial of recovery in a tort action upon the inability to determine damages . . . [is] widely criticized" (footnote omitted) 54 Tulane L.R. 480 at 496, *Story Parchment Co. v. Paterson Parchment Paper Company*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979).

It is also well established that there is in fact "no yardstick for determining the value of loss of consortium; it is a matter to be resolved by the trier of fact." *DeMarines v. KLM Royal Dutch Airlines*, supra at 1057; *Aretz v. United States*, 456 F. Supp. 397 (S.D.Ga.1978).

Some courts have held in attempted wrongful birth actions and its analogues—wrongful life and wrongful conception—that no cause of action exists because the negligent action of the defendant was not the actual cause in fact of the pregnancy but rather the intimacy of the parents was. Thus, any action by parent or child was derivative of actions entirely removed from the allegedly negligent act. This theory not only appears to ignore the United States Supreme Court's holdings in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and its progeny but subscribed to an entirely too narrow interpretation of causation. See Cases, 18 Journal of Family Law 431 (1980).

I would permit the assessment of damages in wrongful birth cases pursuant to the limitations and guidelines I propose for the plaintiff in this opinion.

However, those damages alleged by the plaintiff must be offset or mitigated by a determination of the extent of benefit the parent or parents receive from the existence of

their unplanned child.[4]  *Coleman v. Garrison*, Del.Super., 281 A.2d 616, 83 A.L.R.3d 28 (1971).  In this regard, courts have adopted the Benefit Rule in wrongful birth actions.  *Green v. Sudakin*, 81 Mich.App. 545, 265 N.W.2d 411 (1978);  *Sherlock v. Stillwater Clinic*, Minn., 260 N.W.2d 169 (1977);  *Anonymous v. Hospital*, 33 Conn.Sup. 126, 366 A.2d 204 (1976);  *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971);  *Coleman*, supra.

The Benefit Rule states:

When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable.

Restatement of Torts, § 920, cf. Tort Liability and Mitigation of Damages, D. Dobbs, Remedies § 3.7, C. McCormick, Damages § 77, Restatement of Torts § 918.

It has been argued that the Benefit Rule presents similarly inexact factors as the "child's aid, comfort and society," at 1370, which parents receive in the rearing of a normal child. I assert, however, that these benefits are ascertainable and quantifiable.  While by its very nature, the damages cannot be absolutely certain, they may be obtained with reasonable certainty.  It is my desire to map out the matters which need to be considered by a jury in securing reasonable certainty.

Clearly, the Benefit Rule requires a balancing of the added expense to a family resulting from the presence of an unplanned child with the "aid, comfort and society" that child brings to a family.  Cf. 54 *"Wrongful Life" The Right Not to Be Born*, Tulane L.R. at 498.  While it is clearly possible, though unlikely, that the benefit accruing to par-

4.  The term unplanned child shall be used throughout this opinion. Children born to parents involved in wrongful birth actions are not unwanted in the sense that they are unloved.  A parent who finds a child thrust upon him may nevertheless be loving and prove equal to the task of raising a child.  *Jackson v. Anderson*, 230 So.2d 503 (Fla.App.1970).

ents of an unplanned child may mitigate all damages claimed by the plaintiff, "[i]t cannot be said as a matter of law that a healthy child always confers a benefit greater than the expense of his birth and support." *Coleman,* supra, 281 A.2d at 618.

The Benefit Rule is not without strong criticism from those who reason that damages, if reasonably shown by the plaintiff, need not be mitigated. In, *The Case of the Unwanted Blessing: Wrongful Life,* 31 U.Miami L.R. 1409, Joseph Kaski finds fault with the application of the Benefit Rule as a balancing of the burdens of pregnancy and parenthood against the benefits related to producing and rearing child found in *Troppi,* supra, in the following manner:

According to *Troppi,* the benefits and burdens of pregnancy and parenthood are so integrally related that they should be balanced against each other in applying the same interest limitation to the benefit rule. The court believed that applying the benefit rule in this manner would be best calculated to achieve a fair assessment of damages according to the circumstances of the particular plaintiff, and the circumstances it regarded as being of the greatest moment were the plaintiff's economic resources, family size, age, and marital status. [31 Mich. App. at 254–255, 187 N.W. at 518]

Although the court's reasoning possesses an initial allure, close examination reveals that it is fatally flawed. Certainly, the birth of the child may confer certain intangible emotional benefits upon the parent, but these are benefits the parent did not ask for and quite possibly cannot afford. The defendant can be analogized to an officious intermeddler, and when he argues that the damages assessed against him should be offset by the unsolicited benefits of parenthood, the resemblance is quite striking indeed. Let us say that there are two adjacent and uninhabited tracts of land, one owned by the plaintiff and the other owned by the defendant. The defendant wishes to erect a house on his tract, but as a result of a negligent error, erects it on the plaintiff's property instead. When

the parties discover the error, they are unable to settle their differences and look to the judicial system for a Solomon-like decision. Three possibilities are immediately apparent.

First, the parties may be left as we find them, on the ground that the defendant has conferred an unsolicited benefit upon the plaintiff for which the latter party should not be made to pay. The problem with this approach is that it is quite harsh on the defendant and may unjustly enrich the plaintiff.

Second, the plaintiff may be required to pay the defendant an amount equal to the value of the improvement to the plaintiff. If this approach is followed, the defendant may not recoup his costs, but at least unjust enrichment of the plaintiff is avoided.

Finally, if the plaintiff does not wish to retain the benefit, the defendant may be permitted to enter upon the plaintiff's land for the limited purpose of removing the building to the defendant's own tract.

It will be observed that the *Troppi* court has followed the second solution, and although this is a most equitable approach when inanimate objects are at issue, it is wholly inadequate when we are dealing with children. To illustrate this assertion, let us examine the plight of the forced parent of modest resources, who cannot afford to raise his unplanned child. If the second solution is followed, the plaintiff's damage award will be reduced by the benefits of parenthood, that is, those intangible feelings of love we hope most parents feel for their children. At once, a great anomaly becomes apparent; the more loving the parent, the smaller the damage award and the more the entire family will suffer as scarce economic resources are spread over a greater number of family members.

So what are we to do, follow the third solution and place the child for adoption? Certainly not, the *Troppi* court itself rejects the very idea as abhorent, stating: "The law has long recognized the desirability of permitting a child to be reared by his natural parents." [Id. at 259, 187

N.W.2d at 520] If the forced parent is willing to shoulder the enormous responsibility of parenthood, the law should not throw obstacles in his path but rather should endeavor to do everything in its power to assist him. If this places a difficult burden on the defendant, it is well to remember that he is a tortfeasor, and it is far more equitable to shift the burden to him than to the plaintiffs who placed their faith in him, or the innocent infant for whose birth he is responsible.

What then of the argument that the mother should abort the unplanned child? The very suggestion carries a pungent odor of moral depravity. The defendant, whose tortious act is responsible for the conception of the child, would now force the termination of its existence so that damages assessed against him might be minimized. Moreover, the defendant, who has committed one trespass upon the mother's body, would expose her to yet another trespass.

It thus becomes apparent that the first solution, which seemed so harsh when applied to houses, is in fact the most equitable when applied to children. But our examples have dealt with the forced parent of modest resources. Does this suggest a sort of discrimination against the affluent? It is submitted that the affluent are just as worthy of recovery as the humble. In both cases, economic resources (though scarcer in one situation than the other) must be spread over a greater number of family members with the result that existing members will receive less than their planned share. It might even be argued that, since the tortfeasor takes his plaintiff as he finds him, the damages awarded to the affluent family should even be greater, so existing family members may maintain their current standard of living, and the latest addition to the family will not have to live as a "second class citizen." It could also be argued, however, that the financial injury to the affluent family, although greater in the aggregate, is proportionately less, so that, out of some solicitude for the defendant, the damages should be

geared to the average cost of raising a child with the family supplying anything over that amount if it so desires.

Id. at 1416–1417 (footnotes omitted).

While the argument presented by Mr. Kaski is very convincing, it remains true that under ordinary principles of tort law that the plaintiff must mitigate his damages to whatever extent possible. Restatement of Torts 2d § 918. Similarly, it is true, that children bring substantial joy and affection to their parents. I am well aware of the apparently anomalous result that the loving parent who receives great benefit in return for his affection will receive less economic damages than the parent who has a less healthy relationship with his child; however, our goal is to place the parent of an unplanned child in the shoes he would have been in if he had no child. Certainly, the factors which must be weighed to determine what damages will return the plaintiff to his original position include both economic and noneconomic concerns. The Benefit Rule, though difficult its application may be, clearly presents the most equitable and analytically sound result.

It is asserted that no guidelines may be established to guide the jury in determining damages either as alleged by the plaintiff or after application of the Benefit Rule. I contend that the responsibility placed upon the jury here is no greater than that found in wrongful death or survival actions; and I believe appropriate guidelines may be established to aid the fact finder in determining what damages to award.

Thus, each party bears a unique responsibility in relationship to the process by which damages are to be determined.

The plaintiff will present claims of damages to the fact finder related to the cost of pregnancy and rearing the child through to his majority. The plaintiff shall provide the fact finder with evidence describing family history; standard of living; geographic location; parental aspirations for the child—to the extent reasonably quantifiable—actuarial ascertainment of cost of rearing including cost of food, shelter,

schooling, medical care, and the cost of the maintenance of a child at a level of comfort and security to which a planned child in the plaintiff's family would have experienced; and finally, the court shall consider those additional expenses which plaintiff can demonstrate to the court and which the court can determine are reasonably anticipated expenses. The plaintiff may present evidence by use of expert testimony by economists, educators, medical doctors, or any other expert the court finds appropriate. No trial court should require the plaintiff to show with a high degree of certainty what damages exist. The reasonableness of damages must be viewed in light of what this cause of action admits.

The finder of fact shall determine the benefit which visits the plaintiff as the result of the defendant's allegedly negligent act. It must balance the damages alleged by the plaintiff with benefits alleged by the defendant and reason through the balancing process described in *Troppi,* supra. The fact finder in this manner shall reach a determination as to the amount of damages.

The defendant, pursuant to ordinary principles of tort law shall have the burden of proving the extent of benefit to offset or mitigate the plaintiff's damage claims. *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal.Rptr. 652 (1976).

The defendant must prove to the fact finder's satisfaction, by a preponderance of the evidence that the parents of the unplanned child will benefit. In addition to other elements unique to a particular set of circumstances, the defendant needs to show love and affection, potential financial contributions by the child, or evidence of other satisfaction brought the parent by his relationship with his child.

The defendant may present evidence by use of experts in psychology, psychiatry, sociology, parenting or others. He may present actuarial data indicating the earning potential of the child or actuarial data which determines the contribution of a child to the operation of a household. He also may present evidence of any other kind which the court determines is reasonable and appropriate. However, when the fact finder views this evidence, he must do so in light of the

realization that many of the toils of love of a parent when rearing a child confront the parent with pain unknown to other circumstances. The child's financial or household contributions must be viewed in light of the added financial and emotional burden he contributes to the family.

No court, however, shall consider as evidence of mitigation of damages, in its application of the Benefit Rule, any claim by defendant that the plaintiff did not take an opportunity for an abortion or adoption. Such claims shall not be admissible as evidence of mitigation. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 147 (1973). *Sherlock v. Stillwater Clinic*, supra. All defense claims regarding mitigation shall be made pursuant to the Benefit Rule.

The issues involved in a wrongful birth case touch very closely the privacy rights of parents. Both the United States Supreme Court and the Pennsylvania Supreme Court have expressed strongly the fundamental nature of privacy rights. The burden undertaken by the defendant to prove the extent to which the plaintiff's damages have been mitigated is not a light one. His actions have a profound effect upon the right of potential parents to decide whether to have children. Accordingly, the fact finder shall be instructed that the burden of the defendant may not be taken lightly. The fundamental rights associated with child bearing are stated by the Supreme Court of Ohio in *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976):

> The choice not to procreate, as part of one's right to privacy, has become (subject to certain limitations) a constitutional guarantee. See *Griswold v. Connecticut*, ... [supra.]; *Roe v. Wade*, ... [supra.]; and *Doe v. Bolton*, (1973), 410 U.S. 179, 93 S.Ct. 755, 35 L.Ed.2d 147.

Id. 48 Ohio St.2d at 46, 356 N.E.2d at 499; Contra: *Shaheen v. Knight*, 11 Pa.D. & C.2d 41 (1957).

The right to privacy has been recognized by Pennsylvania Courts. The Supreme Court has stated in *In Re B*, 482 Pa. 471, 394 A.2d 419 (1978):

> There can be no question that American jurisprudence recognizes the right to privacy; the only question being

its limits. See "The Right to Privacy," by Samuel D. Warren and Louis Brandeis, 4 Harvard Law Review 193. As stated in 77 C.J.S. Right of Privacy at page 397, in some but not all, jurisdictions the existence of such a right has been recognized even in the absence of statutory regulation.

Id., 482 Pa. at 483, 394 A.2d at 425. In the instant case, both the physician involved and the hospital at which the surgical procedures were performed were subject to state regulation.

The Pennsylvania Supreme Court has extended the right to privacy to greater limits in *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), U.S. cert. denied, 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980), where, pursuant to P.S.Const. Art. 1 § 8, the right to privacy was held to attach to a check passing through commercial channels. This court shall not make the burden of the defendant a light one without infringing upon a fundamental right.

I recognize a cause of action for the wrongful birthy of a healthy child and would permit damages pursuant to ordinary tort principles as discussed in this opinion.

SPAETH, Judge, concurring and dissenting:

I agree with the opinion of the majority except in one respect. For the reasons stated in my concurring and dissenting opinions in *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496 (1979), and *Stribling v. deQuevedo*, —— Pa.Super. ——, 432 A.2d 239 (1980), I believe that the mother should be permitted to recover (if she can prove) damages for emotional distress attributable to the birth and rearing of her child. I see no reason to change my position simply because the child in this case is not alleged to be physically or mentally disabled. I should expect that a jury would be unlikely to award much, if anything, in the way of damages when the child is a normal, healthy child, although the jury might well award substantial damages when the child is disabled. But I see no principled reason to distinguish between the two cases, and say that in the case of the disabled child, where the parent's distress may be readily accepted by the jury as

genuine and the foreseeable result of the doctor's negligence, damages may be awarded, but in the other, they may not be. The difference between the two cases is not in principle but in difficulty of proof. It is not our role to say to a litigant that because her damages may be difficult to prove, she may not even try to prove them. We should rather trust the jury, here as we do in other cases, to appraise the worth of the evidence presented to it. Suggestions that the parent will receive a windfall, or the doctor be disproportionately punished, seem to me to come down to an expression of lack of faith in the jury system. I think I could distinguish between the two cases. I therefore conclude that so could some one else, assigned to sit on a jury.

HESTER, Judge, concurring and dissenting:

Although I agree that this case must be remanded for trial, it is on the issue of potential damages recoverable by appellant that I must part company with the majority. The instant case is, of course, factually similar to the situations examined in *Speck* and *Stribling*: an allegedly negligent sterilization procedure resulted in the birth of a child contrary to the parent's wishes. The distinguishing hallmark of the instant case is that the child here was born healthy—there are no defects or deformities, no crippling hereditary diseases as attended both children in our former opinions. Despite the absence of post-natal complications in the child, the majority allows appellant to recover the full cost of rearing the child offset by the "child's aid, comfort, and society during the parent's life expectancy." At 1370. Because this holding goes far beyond that which we approved in *Speck*, and because of the speculative verdicts the "benefit rule" will generate and the unwise public policy fostered thereunder, I dissent.[1]

1. It has been observed, most appropriately, that the principle controversy in negligent birth control actions revolves around the question of whether the physician must bear the cost of raising and educating the child. See, *Wilczynski v. Goodman*, 73 Ill.App.3d 51, 62, 29 Ill.Dec. 216, 224, 391 N.E.2d 479, 487 (1979); Note, Wrongful Conception; Who Pays for Bringing Up Baby?, 47 Fordham L.Rev. 418

A number of courts have considered "wrongful birth"[2] suits in the context of the healthy and the unhealthy newborn and have reached varying results. On one side of the spectrum are those courts which place no apparent limit on the amount of damages recoverable for the wrongful birth of a healthy child, including damages incident to the rearing and support of the child. Thus, in *Custodio v. Bauer*, 251 Cal.App.2d 303, 59 Cal.Rptr. 463, 27 A.L.R.3d 884 (1967), the court held that the parents of an unplanned, normal child could recover from the physicians involved all damages proximately caused by a negligently performed sterilization, in accord with normal tort principles:

The mental suffering attendant to the unexpected pregnancy because of the complications which may or may not result, the complications that do result, and the delivery of a child are all foreseeable consequences of the failure of the operation .... Where the mother survives without casualty there is still some loss. She must spread her society, comfort, care protection and support over a larger

(1978); Note, Recovery of Child Support for "Wrongful Birth", 47 Tul.L.Rev. 225 (1972).

**2.** As explained in *Speck*, wrongful birth and wrongful life are generic terms suggesting "factually divergent wrongs." Id., 268 Pa.Super. 353, 408 A.2d at 502. In both kinds of cases:

"The plaintiff alleges that the child's very existence is wrongful in that, had the physician diagnosed the mother's disease that resulted in the child's deformity and informed her of the risk of having a deformed child and of termination of the pregnancy as an alternative, the child would not have been born deformed. The distinction between a wrongful life action and a wrongful birth action is that that former is brought by the child, whereas the latter is brought by the parents. Wrongful conception cases are primarily distinguishable from both wrongful life and wrongful birth cases in that the parents in the latter cases want a healthy child, whereas in wrongful conception cases the parents do not want a child at all. Wrongful conception differs in that the cause of action arises at the time of the unwanted conception that is proximately caused by the acts of the physician."

Note, 47 Fordham L.Rev. 418, 419 (1978); Note, 25 Wayne L.Rev. 961, 967–8 (1978), thus, although this case may more appropriately be labelled as one for wrongful conception, *Sherlock v. Stillwater Clinic*, Minn., 260 N.W.2d 169 (1977) or even wrongful pregnancy, *Bushman v. Burns Clinic*, 83 Mich.App. 453, 268 N.W.2d 683 (1978), I will retain, for convenience, the wrongful birth nomenclature.

group. If this change in the family status can be measured economically it should be as compensable as the former losses.

251 Cal.App.2d at 323–4, 59 Cal.Rptr. at 476 (footnote omitted); accord, *Ziemba v. Sternberg*, 45 App.Div.2d 230, 357 N.Y.S.2d 265 (1974); *Rivera v. State*, 94 Misc.2d 157, 404 N.Y.S.2d 950 (1978); *Betancourt v. Gaylor*, 136 N.J.Super. 69, 344 A.2d 336 (1975); cf. *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496 (1976).

On the other side of the spectrum are those jurisdictions which deny *all* damages when the alleged negligence leads to the birth of a normal child. Illustrative of these cases is *Rieck v. Medical Protective Co.*, 64 Wis.2d 514, 219 N.W.2d 242 (1974). There, the alleged negligence was the failure of the doctor to timely inform the parents of the fact of the mother's pregnancy, the complaint averring that had the parents been so informed, they would have elected an abortion. The court denied the plaintiff's claim for the costs of rearing the child:

> To permit the parents to keep their child and shift the entire cost of its upbringing to a physician who failed to determine or inform them of the fact of pregnancy would be to create a new category of surrogate parent. Every child's smile, every bond of love and affection, every reason for parental pride in a child's achievements, every contribution by the child to the welfare and well-being of the family and parents, is to remain with the mother and father. For the most part, these are intangible benefits, but they are nonetheless real. On the other hand, every financial cost or detriment-what the complaint terms "hard money damages"—including the cost of food, clothing and education, would be shifted to the physician who allegedly failed to timely diagnose the fact of pregnancy. We hold that such result would be wholly out of proportion to the culpability involved, and that the allowance of recovery would place too unreasonable a burden upon physicians, under the facts and circumstances here alleged.

64 Wis.2d at 518–19, 219 N.W.2d at 244–5. (footnote omitted).[3]

To a similar effect are *Terrell v. Garcia*, 496 S.W.2d 124 (Tex.Civ.App.1973)[4]; *Shaheen v. Knight*, 11 Pa.D. & C.2d 41 (1957); cf. *Ball v. Mudge*, 64 Wash.2d 247, 391 P.2d 201 (1964).

Between the two extremes of unlimited recovery and no recovery lay several intermediate approaches allowing some, but not boundless, damages for the wrongful birth of a healthy child. Many courts now adopt the so-called benefits rule of the Restatement (Second) of Torts, § 920.[5] These courts allow recovery of the cost of rearing a healthy child during its minority, but require that damages be offset by any benefits accruing to the parents by virtue of the child's birth.

In keeping with the "same interest" limitation of Restatement, Torts, § 920, supra, and its underlying purpose to prevent unjust enrichment, the trier of fact will be required to reduce [rearing] costs by the value of the

**3.** *Rieck* was distinguished in *Dumer v. St. Michael's Hospital*, 69 Wis.2d 766, 233 N.W.2d 372, 83 ALR 2d 1 (1975) (failure to diagnose rubella), where the unwanted child was born with congenital defects. Damages in this situation were recoverable but "limited to those expenses which they have reasonably and necessarily suffered, and will to a reasonable medical certainty suffer in the future by reason of the additional medical, hospital and supportive expense occasioned by the deformities of the child as contrasted to a normal, healthy child." 69 Wis.2d at 776, 233 N.W.2d at 377.

**4.** As did the Wisconsin court, Texas has similarly drawn a distinction between the wrongful birth of a healthy child. Thus, in *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975), a deformed child was born following the alleged negligence of the physician to diagnose rubella in the mother. The Court distinguished the healthy newborn situation in *Terrell v. Garcia*, supra, and authorized recovery of expenses reasonably necessary for the care and treatment of the child's impairment.

**5.** Sec. 920 provides:
"Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable."

child's aid, comfort, and society which will benefit the parents for the duration of their lives.

*Sherlock v. Stillwater Clinic*, Minn., 260 N.W.2d 169, 176 (1977) (footnote omitted). Accord, *Troppi v. Scarf*, 31 Mich. App. 240, 187 N.W.2d 511 (1971); *Anonymous v. Hospital*, 33 Conn.Sup. 126, 366 A.2d 204 (1976); cf. *Green v. Sudakin*, 81 Mich.App. 545, 265 N.W.2d 411 (1978). Still other courts limit recovery to pregnancy related costs and expenses and the pain and suffering attendant thereto. "Damages based upon hospital and medical costs attending [the mother's] unwanted pregnancy, as they affect her person, have little to do with the child's right to life and its concomitant expenses of upbringing and education." *Wilczynski v. Goodman*, 73 Ill.App.3d 51, 63, 29 Ill.Dec. 216, 225, 391 N.E.2d 479, 488 (1979). These courts thus deny recovery for the costs of the child's upbringing, but allow damages for pain and suffering incident to the pregnancy, loss of consortium during the relevant time period, and the medical costs of the sterilization and unplanned pregnancy. *Wilczynski*, supra; accord, *Coleman v. Garrison*, 327 A.2d 757 (Del.Super.1974), aff'd., 349 A.2d 8 (Del.1975); cf. *Bushman v. Burns Clinic*, 83 Mich.App. 453, 268 N.W.2d 683 (1978).

I have carefully considered the thoughtful approaches to the damages issue taken by these several courts and am not unmindful that whatever avenue is finally chosen will inevitably be colored with notions of public policy and a sensitivity to the conflicting and legitimate interests of the parents, doctors, and child involved.[6] Nevertheless, I am persuaded that the first approach above discussed, that of allowing virtually unlimited damages for the wrongful birth of a healthy child, must be rejected. To allow the parents to keep the child, while shifting the entire cost of its upbringing to the physician, would amount to a windfall to the parents and would impose upon the doctor an intolerable financial burden totally out of proportion to the degree of culpability involved. Moreover, I do not subscribe to the

6. Indeed, one court has observed that "any solution is a selection of a lesser evil." *Bushman*, supra, 83 Mich.App. 453, fn. 3, 268 N.W.2d 683, fn. 3 (1978).

theory that the life of a healthy child can be considered a "damage" to the parents, notwithstanding the assertions in *Custodio v. Bauer*, supra, that "the birth of a child may be something less than [a] 'blessed event' ". 251 Cal.App.2d at 321, 59 Cal.Rptr. at 475. Accordingly, I cannot embrace a rule of damages which would extend a doctor's malpractice liability to the point where he is responsible for providing long term economic support for an otherwise healthy child who is wrongfully born. See, Note, U.Pgh.L.Rev. 550, 558 (1978).

Similarly, to impose *no* damages upon the physician is also an unacceptable result. Such a ruling would provide the medical profession with unwarranted immunity in those cases where the patient seeks to avoid pregnancy. The practical affect of this position would allow tortious conduct by a physician in such cases to be totally uncompensable. "As Justice Rutledge said ... immunity tends to foster negligence while liability tends to induce care and caution." *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 505, 208 A.2d 193, 202 (1965) (Musmanno, J.); *Speck,* supra, 268 Pa.Super. 353, 408 A.2d at 501–2; Feldman, Pa.Trial Guide, § 342 (1978). I am thus unwilling to extend immunity to the physician in this case.

It would seem, then, that an intermediate approach to the damages question is a more desirable response than either of the two extremes. As I have stated, many courts including now this Court, espouse use of the benefits rule of the Restatement (Second) of Torts § 920, but I decline to do so. To allow the jury to consider the satisfaction, joy, and companionship of a child as mitigation of damages against the costs of rearing the child would generate speculative verdicts as there is no firm basis upon which to calculate a dollar amount. "Who can place a price tag on a child's smile or the parental pride in a child's achievement?" *Terrell v. Garcia*, 496 S.W.2d 127, 128 (Tex.Civ.App.1973). Indeed, the Court today does not suggest any concrete rule by which the jury will ascertain a dollar amount representing the child's "benefit" to appellant. In cases where a jury has far more guidance than is provided under today's holding, we have

nonetheless found verdicts to be a product of speculation and conjecture. See, e. g. *Gordon v. Trovato*, 234 Pa.Super. 279, 338 A.2d 653 (1975). While it is true that mere uncertainty as to the amount of damages will not preclude recovery, *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979), it is also clear that the jury must have an intelligent understanding of how damages should be calculated. Stated another way, damages may not be based on guess or speculation. Feldman, Pa.Trial Guide, § 34.2 (1978). The benefits rule, while allowing reasonable certainty in computing the cost of rearing a child, would then countenance a rule of mitigation based upon conjecture and sheer guesswork. I am not willing to embark on such an unchartered course in this Commonwealth without providing our juries with at least some guidance in reaching a principled verdict.

I thus conclude that the final alternative above discussed, that of awarding pregnancy-related costs, to be the most appropriate measure of damages. Such costs will be readily ascertainable and not subject to speculation; moreover, placing limits on the sums recoverable avoids the evils of a windfall to the parents at the enormous expense of the physician. Further, the rule I would adopt is more consonant with the very real expenses attendant to the injury suffered and the obvious difficulties stemming from the unexpected pregnancy of the woman. Thus, should appellant establish liability at trial, I would hold that she be entitled to recover for the pain and suffering and mental anguish incident to the pregnancy and the costs and expenses incurred as a result of the pregnancy.[7]

CERCONE, President Judge, and HOFFMAN, J., join in this concurring and dissenting opinion.

PRICE, Judge, dissenting:

I dissent from the majority's opinion recognizing a cause of action for "wrongful life." I hold to the views I expressed in dissent in *Speck v. Finegold*, 268 Pa.Super. 342,

7. In her complaint, appellant did not request recovery for the cost of the tubal ligation or for loss of consortium. See, *Coleman*, supra.

408 A.2d 496 (1979), which is now on allocatur to our supreme court. Even recognizing the precedent of *Speck*, I dissent from the extension of the *Speck* doctrine to a cause of action for the birth of a healthy, normal child that is declared by its parents as "unwanted" for socioeconomic reasons. To extend the *Speck* doctrine to such a fact situation is, I recognize, a logical progression of legal thought based upon the foreseeability principle that the negligent act of a doctor imposes liability. I submit, however, that public policy recognizing the worth and sanctity of a normal child far outweighs the majority's conclusion and dictates that the law and courts of this Commonwealth refrain from engaging in this complex, intangible weighing of the parenthood of a normal child, a task for which we are ill-equipped. *See Public Health Trust v. Brown*, 388 So.2d 1084 (Fla.App.1980).

Further, although I disagree, I note the commendable effort of the majority in the adoption of the benefit rule in mitigation of damages. Although not expressly stated, I assume this is a burden of proof to be borne by the defendants in such actions. Such matters do not lend themselves to any measure of proof, and must, of necessity, be subject completely to the whims, prejudices, and speculations of the fact-finder. Indeed, it is interesting to observe that precisely because of their speculative nature, damages for *loss* of companionship and mental suffering are not recoverable by the parents in an action for the wrongful death of a child, *see Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979) (Roberts, J., dissenting); *The Pennsylvania R.R. Co. v. Zebe*, 33 Pa. 318 (1858), yet, in this wrongful life action, the majority proposes to allow the jury to measure, for the purpose of mitigation of damages under the benefit rule, the *presence* of similarly inexact factors as the "child's aid, comfort and society," at 1370, which parents receive in the rearing of a normal child.

Pandora's box is indeed open. I would affirm the action of the trial court.