Virgil WILBUR & Wilma WILBUR, His Wife *v.*
Robert L. KERR, M.D. et al

81-174                                    628 S.W. 2d 568

Supreme Court of Arkansas
Opinion delivered March 8, 1982

*Bailey & Paden, P.A.,* for appellants.

*Sidney P. Davis,* of *Davis, Cox & Wright,* for appellees.

DARRELL HICKMAN, Justice. The issue presented to us is whether the parents of a normal, healthy child may recover the expenses of raising that child from a doctor who negligently and unsuccessfully performed a vasectomy on the father resulting in the birth of the unexpected child. The trial court held that as a matter of law such expenses were not recoverable and we agree with that judgment.

The question comes to us from a summary judgment granted to the appellees, Dr. Robert L. Kerr and his professional association. The parties narrowed the issue to the trial court, as they have on appeal, by admitting certain facts. The appellant, Virgil Wilbur, the father of two, sought

a vasectomy to prevent having any more children. The appellee negligently performed two unsuccessful vasectomies on Mr. Wilbur. Mr. Wilbur did not know the operations were unsuccessful, and he and his wife had a normal, healthy daughter — a child neither planned nor expected.[1]

Originally Mr. Wilbur's lawsuit sought other damages besides the expense of raising the child: Mr. Wilbur's medical expenses, pain and suffering, loss of wages and the cost of yet a third vasectomy, damages on behalf of his wife, occasioned by the pregnancy and the birth of the child. The trial court ruled that Mr. Wilbur could claim all of these damages but ruled that the cost of the care, maintenance, support, and education of the child could not be recovered. Mr. Wilbur then amended his request, deleting all damages requested except the expenses for rearing the child, choosing to base his whole lawsuit on that issue.

This is a matter of first impression with us. A lawsuit for the cost of raising an unwanted or unplanned child has been referred to as one for "wrongful birth" or "wrongful conception."[2] The development of the law by the various states which have dealt with this question is relatively recent but rapid. *See* 50 CIN. L. REV. 65 (1981). Most states recognize this as a valid cause for action grounded in tort, but the courts disagree on what damages should be allowed. *Mason* v. *Western Pennsylvania Hospital,* 428 A. 2d 1366 (1981); *Wilczynski* v. *Goodman,* 73 Ill. App. 3d 51, 391 N.E. 2d 479 (1979); *Sherlock* v. *Stillwater Clinic,* 260 N.W. 2d 169 (Minn. 1977); *Anonymous* v. *Hospital,* 33 Conn. Sup. 126, 366 A. 2d 204(1976); *Bowman* v. *Davis,* 48 Ohio St. 2d 41, 356 N.E. 2d 496 (1976); *Stills* v. *Gratton,* 55 Cal. App. 3d 698, 127

---

[1]When the question concerns the birth of an *impaired* child, the courts treat it differently. *See, e.g., Speck* v. *Finegold,* 408 A. 2d 496 (Pa. Super. Ct. 1979); *Jacobs* v. *Theimer,* 519 S.W. 2d 846 (Tex. 1975).

[2]The situation varies. Sometimes it is primarily on behalf of the wife who sought a tubal ligation; sometimes it is against a pharmacist who negligently filled a prescription which would prevent conception. *See Sard* v. *Hardy,* 34 Md. App. 217, 367 A. 2d 525 (1976), rev'd 281 Md. 432, 379 A. 2d 1014 (1977) (tubal ligation); *Troppi* v. *Scarf,* 31 Mich. App. 240, 187 N.W. 2d 511 (1971) (oral contraceptives).

Cal. Rptr. 652 (1976); *Betancourt* v. *Gaylor*, 136 N.J. Super., 344 A. 2d 336 (1975); *Ziemba* v. *Sternberg*, 45 App. Div. 2d 230, 357 N.Y.S. 2d 265 (1974); *Hackworth* v. *Hart*, 474 S.W. 2d 377 (Ky. 1971); *Troppi* v. *Scarf*, 31 Mich. App. 240, 187 N.W. 2d 511 (1971); *Custodio* v. *Bauer*, 251 Cal. App. 2d 303, 59 Cal. Rptr. 463 (1967). Several courts have recognized that the expenses for raising a child who is either unplanned or unwanted are foreseeable damages directly resulting from the negligence of the doctor; a negligent act was committed and there must be compensation for that negligent act. *Sherlock* v. *Stillwater Clinic, supra; Bowman* v. *Davis, supra; Troppi* v. *Scarf, supra; Custodio* v. *Bauer, supra; Ziemba* v. *Sternberg, supra.*

The courts that have allowed such recovery have done so for logical reasons, treating the question as one of ordinary damages. Should parents in this sophisticated day and time not have a right to plan their family and avoid the economic hardship of raising a child they chose not to have? Should a doctor not pay for all the damages occasioned by his negligent act? *Custodio* v. *Bauer, supra.*

Other courts have denied recovery for the expenses of raising a child, on the basis that it is against "public policy." *Wilczynski* v. *Goodman, supra; Rieck* v. *Medical Protective Co.,* 64 Wis. 2d 514, 219 N.W. 2d 243 (1974); *Hays* v. *Hall,* 477 S.W. 2d 402 (Tex. Civ. App. 1972), *rev'd on other grounds,* 488 S.W. 2d 412 (Tex. 1973); *Stewart* v. *Long Island College Hospital,* 35 A.D. 2d 531, 313 N.Y.S. 2d 502 (1970); aff'd. 30 N.Y.S. 2d 695, 332 N.Y.S. 2d 640 (1972); *Shaheen* v. *Knight,* 11 Pa. D. & C. 2d 41 (1957); *Christensen* v. *Thornby,* 192 Minn. 123, 255 N.W. 620 (1934) (Holding the question of damages to be a matter for the legislature).

The questions that have been raised by the judges and courts who have examined this problem demonstrate that the answer is not easy, nor can any disposition be completely satisfactory. The courts that have denied recovery because of public policy articulate that policy in different ways. For example, the Texas Court of Civil Appeals decided that the joy and pride in raising a healthy child far outweighs any economic loss suffered by the parents; the birth of a child is a benefit on which an economic price tag cannot be placed.

The court also remarked that recovery should be denied because damages are too speculative and uncertain. *Terrell v. Garcia*, 496 S.W. 2d 124 (Tex. Civ. App. 1973), *writ ref. N.R.E* (Tex. 1974), *cert. denied* 415 U.S. 927 (1974). In *Rieck v. Medical Protective Co., supra,* the Wisconsin court viewed the issue as parents pursuing a claim for an unwanted child; they now choose to keep the child but transfer the cost of rearing the child to the doctor, creating a new category of surrogate parent. The Wisconsin Court decided in the final analysis it would be against public policy to allow such damages.

The question has been properly raised whether parents who do not want a child should place it up for adoption or abort the child's birth to mitigate their damages. *See Ziemba v. Sternberg, supra* (dissenting opinion). Parties are supposed to mitigate their damages. DOBBS, HANDBOOK ON THE LAW OF REMEDIES. But courts recognizing this cause of action have rejected the argument that parents should have to make such an election. *See,* e.g. *Sherlock* v. *Stillwater Clinic, supra.*

Examining the problem more deeply, authors have addressed the possible harm to the unwanted child referring to it, indelicately but realistically, as an "emotional bastard;" that is, a child who is unwanted by his family, one who will know some day that he was unwanted and whose cost of raising was paid for by another person. *Shaheen* v. *Knight, supra;* 50 CIN. L. REV. 65 (1981); Robertson, *Civil Liability Arising from "Wrongful Birth" Following an Unsuccessful Sterilization Operation,* 4 Am. J. of L. & M. No. 2, 131. One court has gone so far as to make the parents' name anonymous to protect the child. *Anonymous* v. *Hospital, supra.* Another court in its opinion excused the parents for filing the lawsuit, saying that no doubt they did so on principle, and not because the child was unwanted. *Rieck* v. *Medical Protective Co., supra.* One writer went so far as to suggest that the possible harm to the child might not be great when it discovered $50,000 was collected on its behalf. Bryan, *Damages — The Not So "Blessed Event,"* 46 N.C. L. REV. 949, 952 (1968). So, the child's welfare has troubled all who have examined the problem.

Another line of cases has reached a compromise of sorts between those states that allow such damages and those that deny them. Recognizing that a child, although unwanted, is usually a joy, pleasure and benefit, these states allow recovery of expenses for raising the child but allow the jury to offset an award if they find the parents actually love the child and it is a "benefit" to them. *Troppi* v. *Scarf, supra; Anonymous* v. *Hospital, supra; Mason* v. *Western Pennsylvania Hospital, supra; See* RESTATEMENT (SECOND) OF TORTS § 920 (1979). Of course this view places the parents in the position of going before a jury and demonstrating they do not want the child in order to get a greater award. If they admit that the child is a welcome addition that will be loved, cherished, and properly raised, they may get nothing.

There is also the problem of the money recovered. Should it be kept by the parents for the sole use of the unwanted child or used by the whole family? One writer has suggested that a guardian ad litem should be appointed for the benefit of the child to see that the money recovered actually goes to the raising of the child. *See* Robertson, Civil Liability Arising from "Wrongful Birth" Following an Unsuccessful Sterilization Operation, supra, at 153.

In sifting through these decisions and studying the words and thoughts of judges and writers, it is understandable why the courts have reached different results. It is a question that searches the nature and validity of our civil law system which allows money damages to compensate for wrongs that are intangible, such as wrongful death or emotional anguish, things which cannot really be made right by money. Courts denying recovery because of "public policy" are bothered by the idea that a normal, healthy life should be the basis for compensable wrong. *Wilczynski* v. *Goodman, supra.*

We are persuaded for several reasons to follow those courts which have declined to grant damages for the expense of raising a child. It is a question which meddles with the concept of life and the stability of the family unit. Litigation cannot answer every question; every question cannot be

answered in terms of dollars and cents. We are also convinced that the damage to the child will be significant; that being an unwanted or "emotional bastard," who will some day learn that its parents did not want it and, in fact, went to court to force someone else to pay for its raising, will be harmful to that child. It will undermine society's need for a strong and healthy family relationship. We have not become so sophisticated a society to dismiss that emotional trauma as nonsense.

We do not say that a doctor performing such a negligent act should not have to pay for that act. He would be responsible for any and all proper damages connected with the operation and connected with the pregnancy. *Wilczynski* v. *Goodman, supra.* We join those courts which recognize these as valid damages that may be recovered in such cases. It is the expense of raising an unwanted, healthy child that we find should not be allowed. We must deny that claim as against public policy.

Affirmed.

ADKISSON, C.J., and DUDLEY, J., dissent.

ROBERT H. DUDLEY, Justice, dissenting. The issue is whether public policy should be invoked to prevent a common law cause of action against a doctor who is admittedly negligent in a surgical attempt at vasectomy.

It was resolved at common law, first in a line of specific, reasoned decisions, that a tortfeasor should be liable for his negligence. Those specific decisions built, by gradual accretion, to the principle of law that a tortfeasor is liable for all damages flowing from the negligent act. That principle became the major premise from which conclusions are now deduced. See Aldisert, The Nature of the Judicial Process: Revisited, 49 U. of Cincinnati L. Rev. 1 (1980). Today, in the case at bar, the majority declines to deduce liability from the major premise of liability for a negligent act and invokes public policy as the rationale to avoid years of well-settled common law.

For some time I have been disquieted by the lack of a standard by which we determine when to apply public policy and the lack of a meaningful definition by which we discover what constitutes public policy. This case involves wide-ranging social and economic issues which will affect parents and children for a number of years. Today we have invoked public policy with no true understanding of why it is applied or how it is discovered. The doctrine of public policy has not been built by accretion, but has experienced growth by eruption. I hope, at some later time, to be able to define standards for its use. Perhaps, in the meantime, our friends in academe will be of assistance by writing a deep and meaningful treatise on a suggested doctrine. While I cannot yet define when and why I would invoke public policy, I can define when I would not invoke public policy. I would not invoke the doctrine of public policy when there is no logical sense of conscience. While, in this case, I find many good policy reasons to support the view of the majority I find an equal number of policy reasons against that view. Therefore, I would not invoke the doctrine; instead, I would follow the common law.

The well written majority opinion correctly points out many of the holdings including those in Wisconsin and Texas. In *Rieck* v. *Medical Protective Co.,* 64 Wis. 2d 514, 219 N.W. 2d 243 (1974) and *Terrell* v. *Garcia,* 496 S.W. 2d 124 (Tex. Civ. App. 1973), there is the suggestion that the child be considered as worth its cost or else it be put up for adoption. Yet, many parents feel a moral sense of obligation to raise, as best they can, a child unwanted at conception. "A living child almost universally gives rise to emotional and spiritual bonds which few parents can bring themselves to break." *Troppi* v. *Scarf,* 31 Mich. App. 240, 187 N.W. 2d 511 at 519 (1971). I can find no logical sense of conscience for a public policy which requires the mother to abort, put the child up for adoption, or else deprive the family members, including brothers and sisters, of their planned share of family income. "The compensation is not for the so-called unwanted child or 'emotional bastard' [see Case Note, 9 Utah Law Rev. 808 (1965)] but to replenish the family exchequer so that the new arrival will not deprive the other members of the family of what was planned as their just

share of the family income." *Custodio* v. *Bauer*, 251 Cal. App. 2d 303, 59 Cal. Rptr. 463 (1967).

A public policy which subtly encourages abortion or adoption, as today's holding necessarily does, is inconsistent with the stated goal of family stability and has no logical sense of conscience. Reference is made to the emotional damage of the child who finds out he or she was unwanted, but that emotional injury is no greater "than to be found in many families where 'planned parenthood' has not followed the blueprint." *Custodio* v. *Bauer*, supra. The expense of raising an unwanted and healthy child should not be considered as a matter of public policy when we will find that the same public policy allows us to hold that the parents of a deformed or diseased child are able to recover. This is inconsistent, see *Mason* v. *Western Pennsylvania Hospital*, Pa. Super., 428 A. 2d 1366 (1980), and demonstrates the consequence of invoking public policy without standards.

I would not invoke public policy in order to deny a cause of action against the common law rules of tort damages when there is no logical sense of conscience.

I recognize this is an extremely difficult case but rather than invoke public policy I would allow the cause of action and would allow the jury to reduce damages by the "benefit rule," § 920 Restatement of Torts (Second). It provides:

> When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damges, to the extent that this is equitable.

Thus, the jury in setting damages would be allowed to offset the value of the child's aid, comfort and society during the parents' life expectancy against the cost of rearing the unplanned child. See *Sherlock* v. *Stillwater Clinic*, 260 N.W. 2d 169 (Minn. 1977).

I am authorized to state that Chief Justice ADKISSON joins in this opinion.