CLAPHAM v YANGA

Docket No. 46188. Submitted June 2, 1980, at Detroit.—Decided November 21, 1980. Leave to appeal applied for.

Loriann Clapham, a minor, and her parents, Nancy and Samuel Clapham, brought suit in the Livingston Circuit Court against Ismael Yanga for damages for medical malpractice in the diagnosis and treatment of Loriann, whose pregnancy was diagnosed as obesity and low blood pressure. From a judgment for plaintiffs, Paul R. Mahinske, J., defendant appeals. *Held:*

1. Defendant asserts that the trial court erred in allowing plaintiffs to amend their complaint at trial to allege the deprivation of Loriann's right to terminate her pregnancy as a basis for relief. The court rules provide for liberal handling of requests to amend. The decision is within the discretion of the trial court, which found that defendant was not surprised. Defendant did not show that he was prejudiced. There was no abuse of discretion.

2. Defendant asserts that the court's instruction on the applicable standard of care was contrary to the locality rule which provides that a general practitioner's conduct be measured by the standard of professional competence existing in his or similarly situated communities. Assuming that the instruction was erroneous, the error was harmless, since the only testimony concerning the standard of care was limited to the locality in which defendant practiced.

3. Defendant contends that the court instruction to the jury

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 772.
    61 Am Jur 2d, Pleading § 309.
[2] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 214.
[3] 5 Am Jur 2d, Appeal and Error § 776.
[4] 31 Am Jur 2d, Expert and Opinion Evidence § 19.
    61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 197, 199 *et seq.*
[5] 75 Am Jur 2d, Trial § 153 *et seq.*
[6] 22 Am Jur 2d, Damages §§ 30-32, 200.
[7] 22 Am Jur 2d, Damages § 345 *et seq.*
    Tort liability for wrongfully causing one to be born. 83 ALR3d 15.

to consider the fact that a child will not exercise the same degree of care as an adult was inapplicable. Defendant admitted in his deposition that it was not unusual for some patients, particularly minors, to attempt to hide their pregnancies. The instruction was germane to this case and not erroneous.

4. The decision to permit a party to reopen its proofs prior to submission of the case to the jury is one entrusted to the sound discretion of the trial court. The judge permitted the proofs to be reopened after a juror submitted a note to him during a recess which posed questions going to the issue of Loriann's negligence. The court specifically stated that, "I feel that it is in the best interest of the trial of this particular case that the jurors have legitimate questions answered as they have put forward". The trial court's stated rationale for allowing the proofs to be reopened was a sufficient reason on the facts of this case and did not constitute an abuse of discretion.

5. Liability may be imposed for the child-rearing costs of a baby born due to a defendant's negligence. A choice by grandparents not to provide care for their grandchild in order to mitigate damages is not a reasonable choice. A party is not required to choose the course of action which would be most efficient in mitigating damages unless that course of action would be regarded as reasonable by ordinary persons. The fact that Nancy and Samuel Clapham "voluntarily" provided care for Loriann's baby does not prevent them from recovering damages for the costs of raising the child.

6. The instruction to the jury that any damages awarded Mr. and Mrs. Clapham would be placed in trust to pay the costs of raising the baby was not erroneous.

Affirmed.

1. PLEADING — AMENDMENT — COURT RULES.
   A decision to permit amendment of a pleading is within the trial court's discretion and will not be upset absent an abuse of discretion (GCR 1963, 118.1).

2. PHYSICIANS AND SURGEONS — MEDICAL MALPRACTICE — STANDARD OF CARE — JURY INSTRUCTIONS.
   An instruction on the applicable standard of care in a medical malpractice action which failed to limit the standard to that locality is harmless where the only testimony regarding the standard of care was limited to the appropriate locality.

3. APPEAL — NEW TRIAL — COURT RULES.
   A defect in something done by the court is not grounds for

granting a new trial unless failure to do so would be inconsistent with substantial justice (GCR 1963, 529.1).

4. PHYSICIANS AND SURGEONS — MEDICAL MALPRACTICE — STANDARD OF CARE — NEGLIGENCE.

Expert testimony is required in a medical malpractice case to show that a doctor has violated the standard of care required, unless the physician's conduct is of such a character that laymen could find negligence.

5. TRIAL — REOPENING PROOFS.

The decision to permit a party to reopen its proofs prior to submission of the case to the jury is one entrusted to the sound discretion of the trial court; a decision to allow a plaintiff to reopen its case so that the jurors might have legitimate questions, which were communicated to the judge at his instruction, answered does not constitute an abuse of discretion.

6. DAMAGES — MITIGATION OF DAMAGES — REASONABLENESS — CHILD CARE.

A party is not required to choose the course of action which would be most efficient in mitigating damages unless that course of action would be regarded as reasonable by ordinary persons; a choice by grandparents not to provide care for their grandchild in order to mitigate damages is not a reasonable choice; the grandparents of a minor child's unwanted baby may recover damages where they provide for the baby's care, just as the baby's parents might have.

7. DAMAGES — MEDICAL MALPRACTICE — CHILD CARE — JURY INSTRUCTIONS — TRUSTS.

Liability may be imposed for the child-rearing costs of a baby born due to a defendant physician's negligence; an instruction that any damages awarded would be placed in trust for that purpose was not erroneous.

*Peter R. Barbara & Associates, P.C.* (by *Peter R. Barbara* and *Samuel H. Pietsch),* for plaintiffs.

*Sullivan, Ranger, Ward & Bone, P.C.,* for defendant.

Before: R. M. Maher, P.J., and Bronson and
T. C. Quinn,* JJ.

Per Curiam. Following a jury trial conducted
April 17, 1979, through April 20, 1979, in the
Livingston County Circuit Court, defendant was
found liable for medical malpractice in his diagno-
sis and treatment of plaintiff Loriann Clapham.
The combined jury verdict in favor of plaintiffs
was $133,700. Of this total, plaintiff Loriann Clap-
ham was awarded $69,000 for personal damages.
Additionally $57,000 was awarded for the expense
of raising Joel Clapham, Loriann's child, who was
born following defendant's failure to diagnose Lo-
riann's pregnancy. Each of these awards was re-
duced by 30% based upon Loriann's comparative
negligence, resulting in an award of $48,300 for
personal damages and $39,900 to be held in trust
for the expenses incurred in the rearing of the
baby. Plaintiff Nancy Clapham, Loriann's mother,
received an award of $64,000, reduced by 65%
based on her negligence, leaving a net total of
$22,400. Loriann's father, plaintiff Samuel Clap-
ham, was awarded $35,000, with a 34% reduction
due to his comparative negligence, leaving $23,100.

Loriann Clapham was 14 years old when her
mother took her to defendant for a medical exami-
nation. Loriann had been complaining of dizzy
spells, fainting, and missed menstrual periods.
According to both Loriann and Nancy Clapham,
defendant said that these symptoms were a mani-
festation of obesity and low blood pressure. In fact,
Loriann was pregnant. Loriann saw defendant for
medical services six times between October 14,
1974, and January 28, 1975. Mrs. Clapham accom-

* Former Court of Appeals Judge, sitting on the Court of Appeals
by assignment pursuant to Const 1963, art 6, § 23 as amended in
1968.

panied her daughter to each appointment except one. At no time was either mother or daughter informed that Loriann might be pregnant.

According to defendant, questions were specifically posed to Loriann concerning problems with menstrual periods. However, both she and Mrs. Clapham indicated there were no problems in this regard. Defendant further denied he had ever been informed that Loriann had missed menstrual periods.

The videotaped deposition testimony of Dr. Kalman Gold, who stated that he was a specialist in obstetrics and gynecology, was shown to the jury. He stated that although his practice was based in Toledo, Ohio, he was familiar with the standard of care for a general practitioner in obstetrical care in Michigan. In his opinion, it constituted a breach of this standard of care to fail to conduct tests ruling out the possibility of pregnancy when a patient with Loriann's symptoms seeks treatment.

Dr. Avelardo Bustillo, a general practitioner and defendant's associate, examined Loriann on three occasions. After defendant was served with the complaint in this matter, he told Dr. Bustillo that he had suspected pregnancy during Loriann's initial examination. Bustillo indicated that, if defendant had told him pregnancy was suspected, he would have requested Loriann's permission to conduct specific pregnancy tests.

Loriann indicated that at the time of trial she was employed at a fast-food restaurant and was making minimum wage. Prior to her pregnancy, she intended to get training to become a registered nurse. However, when the baby was born, she dropped out of high school. Loriann also stated that, had she known she was pregnant, she would have sought an abortion. Other testimony was

presented regarding the emotional and financial strain on a family where an unmarried, teenage daughter bears a child.

The issues raised on appeal fall into two basic categories—those which primarily concern the question of liability and those which primarily impact on the issue of damages. We will consider the problem of defendant's liability first.

Defendant argues that the trial court committed reversible error by permitting the plaintiffs to amend their complaint at trial to allege as a basis for relief the deprivation of Loriann's right to terminate her pregnancy. Michigan's court rule regarding the amendment of pleadings provides for a liberal handling of requests to amend. GCR 1963, 118.1, *Ben P Fyke & Sons v Gunter Co,* 390 Mich 649, 656-657; 213 NW2d 134 (1973). A decision to permit an amendment is one within the trial court's discretion and will not be upset absent an abuse of discretion. *Worth v Dortman,* 94 Mich App 103, 113; 288 NW2d 603 (1979).

In the case at bar, the amendment offered did not differ substantially from the theories previously asserted. The defendant could not have been surprised by the amendment, given Loriann's deposition testimony that she would have preferred an abortion had she been aware of her condition. The trial court specifically found that defendant was not surprised. Defendant is unable to show any specific prejudice resulting from the amendment. For these reasons, the trial court's decision permitting the amendment did not constitute an abuse of discretion.

Defendant also argues that the trial court's instruction on the standard of care was reversibly improper. It is alleged that the instruction was contrary to Michigan's "locality rule" which pro-

vides that a general practitioner's conduct will be measured by the standard of professional competence existing in his or similarly situated communities in light of the state of the art. At present, Michigan continues to adhere to the locality rule although its continuing vitality is in some doubt. See, *Siirila v Barrios,* 398 Mich 576; 248 NW2d 171 (1976).[1]

In the instant case, the trial court instructed:

"A general practitioner is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner of the same class acting under the same or similar circumstances.

"In considering whether the defendant, Dr. Yanga, practiced within that standard for the purposes of this case, you may consider whether Dr. Yanga should have diagnosed pregnancy in this case based upon the general state of knowledge on the subject of pregnancy diagnosis within the medical community of general practitioners as a whole."

It is arguable whether this instruction should fail under the locality rule. The court's reference in the charge to a practitioner acting under "the same or similar circumstances" would embody the same community or similar communities as one of the circumstances for the jury to consider in determining if the standard of care was breached.

Assuming that the instruction was erroneous, we are convinced that the error does not constitute grounds for reversal. The only direct testimony concerning the standard of care was that of Dr.

[1] Although we reluctantly follow the locality rule, we agree with Justices WILLIAMS and LEVIN in *Siirila* that the locality rule no longer makes any sense. The rule seems to be a throwback to the days when it was difficult to rapidly disseminate the latest medical knowledge.

Gold.[2] This testimony was properly limited to the applicable locality in which defendant practices. Thus, the only evidence upon which the jury could have premised its conclusion that the standard of care was breached was the testimony specifically tied to the appropriate locale. Consequently, it is difficult to see how defendant was prejudiced by the instruction, even if it was erroneous. It is an elementary principle of Michigan jurisprudence that a defect in something done by the court is not grounds for granting a new trial unless this is "inconsistent with substantial justice". GCR 1963, 529.1.

In *LeBlanc v Lentini*, 82 Mich App 5, 17-19; 266 NW2d 643 (1978), *lv den* 403 Mich 807 (1978), this Court recognized that in some cases local standards might be uniform throughout the United States. After reaching this conclusion, the Court upheld a decision to allow a medical expert to testify on the standard of care in the local area, even though he was unfamiliar with the locale. The record in this case suggests that such a nationwide locality standard exists in respect to the tests and treatment to be performed on one who has missed menstrual periods and complains of dizzy spells and fainting. This being the case, it would make no difference if the standard of care instruction was tied to a specific locality or explicitly posited as having nationwide applicability. While the latter instruction would be technically defective, since the substantive standard is the same, it would be unnecessary and inappropriate to reverse the case for a new trial.

---

[2] Dr. Bustillo indirectly gave testimony relevant to the standard of care when he stated that had he been aware of defendant's suspicion that Loriann was pregnant, he would have asked permission to conduct a pregnancy test. Bustillo, who was defendant's associate, gave particularly damaging testimony. It suggested that defendant breached the standard of care routinely imposed in his own practice. It is difficult to imagine a much narrower "locality".

We also note that, while expert testimony is essential to establish that a doctor has violated the requisite standard of care in most cases, if the physician's conduct is such that a layperson could ascertain that the medical practitioner's acts were negligent, such testimony is not needed. *Heins v Synkonis,* 58 Mich App 119, 122; 227 NW2d 247 (1975), *Murphy v Sobel,* 66 Mich App 122, 124; 238 NW2d 547 (1975), *Lince v Monson,* 363 Mich 135, 141; 108 NW2d 845 (1961). We conclude that a jury could find, without specific testimony on the standard of care, that it is negligent not to give a patient who complains of the symptoms experienced by Loriann a pregnancy test. *This is particularly true in light of defendant's admission that he suspected from the initial visit that Loriann was pregnant.* We note that Mrs. Clapham testified she assumed a pregnancy test had been conducted since the probable cause of her daughter's condition was obvious. However, when defendant said nothing about the possibility of pregnancy, she did not concern herself with it.

Defendant also charges that the trial court committed reversible error in giving a modified SJI 10:07. Defendant contends that the instruction was inapplicable in this case. SJI 10:07 recognizes that a child will not exercise the same degree of care for himself as will an adult. In *Moning v Alfono,* 400 Mich 425, 446; 254 NW2d 759 (1977), in the context of a claim of negligent entrustment of a dangerous instrumentality to a child, the Court stated:

"[A] reasonable person will have in mind the immaturity, inexperience and carelessness of children. If, taking those traits into account, a reasonable person would recognize that his conduct involves a risk of

creating an invasion of the child's or some other person's interest, he is required to recognize that his conduct does involve such a risk. 'He should realize that the inexperience and immaturity of young children may lead them to act innocently in a way which an adult would recognize as culpably careless, and that older children are peculiarly prone to conduct which they themselves recognize as careless or even reckless.' 2 Restatement, *supra,* § 290, comment k."

In our opinion, the same rationale is applicable to medical malpractice actions which involve a question of whether the standard of care has been breached. In this case, Dr. Yanga's deposition was received into evidence. In his deposition, Dr. Yanga stated that it was not unusual for some patients, *particularly minor patients,* to attempt to hide their pregnancies. As such, the modified SJI 10:07 was germane to this matter.

Prior to submission of the case to the jury, defendant moved for a mistrial alleging that: (1) the jury was discussing the case prior to its conclusion; and (2) plaintiffs were incorrectly permitted to reopen their proofs. Defendant contends that the trial court's decision to deny the motion constitutes reversible error.

The decision to permit a party to reopen its proofs prior to submission of the case to the jury is one entrusted to the sound discretion of the trial court. *Bonner v Ames,* 356 Mich 537, 541; 97 NW2d 87 (1959), *Klee v Light,* 360 Mich 419, 424; 104 NW2d 207 (1960). In the instant case, the judge permitted the proofs to be reopened after a juror submitted a note to him during a recess which posed questions going to the issue of Loriann's negligence. The court specifically stated that, "I feel that it is in the best interest of the trial of this particular case that the jurors have

legitimate questions answered as they have put forward". We believe that the trial court's stated rationale for allowing the proofs to be reopened was a sufficient reason on the facts of this case and did not constitute an abuse of discretion.

Defendant's contention that the jury discussed the case prior to the conclusion of the trial is based on the fact that several questions were forthcoming from individual jurors during the course of trial. However, this does not prove that the jurors discussed the case among themselves. The trial court specifically charged the jurors in its preliminary instructions that if any of them had a question, he or she should write it out and give it to the court officer. Nothing which happened during the course of the proceedings leads us to believe that the jury was not simply following this instruction. Moreover, the trial court admonished the jurors not to discuss the case among themselves. The absence of evidence indicating that conversations actually occurred prohibits a finding of reversible error. *People v Scott,* 55 Mich App 739, 746; 223 NW2d 330 (1974).

We now turn to resolution of the issues raised concerning the assessment of damages. Defendant first contends that the jury was allowed to award damages to plaintiff Loriann for the future care of Joel when, in fact, the child was being provided for by plaintiffs Samuel and Nancy Clapham. Furthermore, defendant states that the court's instructions also allowed Samuel and Nancy to be awarded monies for the child's future care. Thus, the instructions are alleged to have allowed the jury to impose duplicative awards.

An examination of the record shows this claim to be without merit. Loriann did care for her child for a period of 16 months. The court's instructions

allowed the jury only to award damages to Loriann for the child's care *up to the present time.* The instructions permitted the jury to award Loriann's parents, the current guardians of the child, monies to compensate them for the care of the boy *in the future.* The charge did not allow duplication of the judgment for either past or future expenses incurred in the rearing of the boy. Consequently, the instructions were proper.

Defendant next contends that it was error for the court to charge the jury that it could award Samuel and Nancy Clapham damages to compensate them for the impairment of their lifestyle, costs of raising Loriann's son, and Mrs. Clapham's loss of earning capacity as they voluntarily assumed the duties of guardianship. The trial court agreed that Samuel and Nancy Clapham should not be able to personally profit from an award designed to provide funds for the upbringing of the child. Consequently, the judge determined that any such award returned by the jury would be placed in trust for the rearing of Joel.

We begin our analysis of this issue by holding that Mr. and Mrs. Clapham did not lose their rights to receive damages because they voluntarily assumed legal guardianship of their daughter's offspring. Although this burden was "voluntarily assumed" in a strictly legal sense, it takes no legal scholarship to see the dubiousness in the claimed voluntariness. Once their 15-year-old daughter proved herself incapable of caring for the infant, the Claphams had the choice of acquiescing in Loriann's decision to adopt Joel out, an alternative which would undoubtedly have been emotionally and morally wrong for them and most grandparents similarly situated, or caring for the baby themselves. Unless a decision is between alterna-

tives which ordinary persons would recognize as reasonable, a party is not required to mitigate damages by "choosing" the course which would be the most efficient in minimizing damages. *Troppi v Scarf,* 31 Mich App 240, 258; 187 NW2d 511 (1971), *lv den* 385 Mich 753 (1971). *Cf., Romankewiz v Black,* 16 Mich App 119; 167 NW2d 606 (1969). Plaintiffs were not faced with a choice most ordinary, similarly situated individuals would consider reasonable. Plaintiffs could have chosen not to care for their grandchild and witness the continuing disintegration of their family, or assume guardianship. For most, this constitutes no real choice.

We are also convinced that allowing grandparents to receive damages where they have assumed the responsibility of rearing their minor daughter's child fosters important state policy. The Child Custody Act of 1970 provides that custody decisions are to be made to promote the "best interests of the child". MCL 722.23; MSA 25.312(3). Although there was no custody battle in this case, guardianship with the grandparents was a clearly superior placement alternative to adoption. At the time Joel would have been put up for adoption, he was 16 months old. It is more difficult to place infants at this age than newborns, and it is possible that no satisfactory adoptive placement could have been achieved. Moreover, the evidence shows that during the period Loriann was caring for Joel, Mr. and Mrs. Clapham were actively involved with the baby. During some of the period of Loriann's custody of the child, she and her son actually lived in the Clapham home. By 16 months of age, bonding between the baby and his mother and grandparents had already occurred. The psychological impact on the child of ripping him from his grand-

parents and mother, who, however immature and unable to cope with parenthood, was a familiar source of comfort and care, and placing him in alien surroundings, could be a devastating blow to the boy's young psyche. This early rejection could haunt him for life, even assuming a suitable adoptive home was found. See, Goldstein, Freud, and Solnit, *Beyond the Best Interests of the Child* (MacMillan Publishing Co, 1973).[3] To absolutely deprive grandparents of damages in circumstances such as these would weaken the primary state goal in child custody. Grandparents who would prefer to care for a minor daughter's baby, rather than have the child adopted out, might be economically forced to allow the latter to occur.[4] In the great majority of cases this would be bad for the grandparents, mother, and child. Indeed, the only individual to profit from such a holding would be the defendant doctor who was allowed to escape the consequences of his negligence.

[3] The central thesis of *Beyond the Best Interests of the Child* is that placement decisions should safeguard the child's need for continuity of relationship. The authors state:

"Physical, emotional, intellectual, social, and moral growth does not happen without causing the child inevitable internal difficulties. The instability of all mental processes during the period of development needs to be offset by stability and uninterrupted support from external sources. Smooth growth is arrested or disrupted when upheavals and changes in the external world are added to the internal ones." *Op. cit.,* 32.

The authors also note that if adoption occurs after the early weeks of an infant's life the chances of the adoptive parents becoming the "psychological parents" (the caretakers whom the child comes to trust as the source of both physical and emotional support) vastly diminishes.

[4] State policy also favors an active involvement between a child and his grandparents. A revision to MCL 722.27; MSA 25.312(7), approved June 18, 1980, to take immediate effect, allows the circuit courts to provide for reasonable visitation of a child by his maternal or paternal grandparents. Given this expression of legislative policy, we believe that we cannot permissibly decide this case in a way which would tend to weaken the bonds and commitment between grandparents and grandchild. The law should not act to the detriment of familial relationships.

The only thing novel about this case is our holding that the grandparents of a minor child's baby may obtain damages where they provide for the infant's care, just as the baby's parents might have. See, *Troppi, supra, Stephens v Spiwak,* 61 Mich App 647; 233 NW2d 124 (1975), *lv den* 395 Mich 761 (1975), *Green v Sudakin,* 81 Mich App 545; 265 NW2d 411 (1978), *lv den* 403 Mich 855 (1978). We believe this is a sound and minor extension of existing precedent. A child's grandparents cannot be treated like total strangers in respect to a claim such as the one presented here.

On appeal, defendant notes that *Troppi* and its progeny apply the so-called benefits rule in assessing damages. This rule provides that where a benefit, as well as a harm, is conferred by a tortfeasor, the benefits must be weighed against the elements of claimed damage. In the instant case, the trial court did not so instruct the jury. However, defendant never requested that a "benefits rule" instruction be given nor did he object to the omission. Instead, defendant simply argued that the grandparents were not entitled to damages because they voluntarily assumed guardianship. Even on appeal defendant does not directly argue that the failure to give such an instruction should be a basis for reversal. As such, any question about the benefits rule is not preserved for appeal.

Defendant lastly contends that the court's instruction indicating that any damages assessed for the rearing of the baby would be placed in trust for this purpose constituted error in that it recognized a "wrongful life" action. We disagree. As noted previously, Michigan has recognized that liability may be imposed for the child-rearing costs of a youngster born due to a defendant's negli-

gence. The monies to be placed in trust were intended to be used for the expense of raising Joel. The award did not constitute a judgment directly in the child's favor. The infant has no right to control these funds or to spend them as he sees fit. The power of disposition rests in the grandparents with the condition that they be used to provide for Joel during his minority—precisely the reason damages for the child-rearing costs of a youngster are ever recoverable.

Affirmed.