[Civ. No. 24530. Fourth Dist., Div. One. Jan. 24, 1983.]

CHARMIAN C. CZUBINSKY, Plaintiff and Appellant, v.
DOCTORS HOSPITAL, Defendant and Respondent.

COUNSEL

George R. McClenahan and Harry V. McGahey for Plaintiff and Appellant.

Douglas R. Reynolds and Ault, Midlam & Reynolds for Defendant and Respondent.

OPINION

**STANIFORTH, J.**—As Charmian C. Czubinsky was coming out of anesthesia, after a routine and uneventful surgical procedure to remove an ovarian cyst, she went into cardiac arrest and suffered a severe loss of oxygen to her brain resulting in permanent and total paralysis. She now exists in a semi-comatose state. A unanimous jury awarded 28-year-old Czubinsky damages in the sum of $982,000 against Doctors Hospital for her catastrophic injuries. At the time Czubinsky experienced the postoperative complications, only the anesthesiologist (Dr. Kushner) and the operating room (OR) technician (Harman) were present in the OR. The operating surgeon, Dr. Rand, had left the room to prepare for another surgery. The circulating nurse (Werner) left the room in response to a call from Dr. Rand. As a result the OR was inadequately staffed at a most critical period following surgery. In the face of uncontradicted evidence warranting a jury finding of gross neglect by hospital personnel, the trial court determined there was no substantial evidence to support the verdict and granted a judgment notwithstanding the verdict. Czubinsky appeals.

## DISCUSSION

### I

■ The trial court, on a motion for judgment notwithstanding the verdict, is not permitted to reweigh the evidence or judge the credibility of witnesses. If there is substantial evidence to support the verdict, including applicable presumptions or inferences reasonably deducible from the evidence, granting a judgment notwithstanding the verdict is improper. (See *Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282]; *Montijo* v. *Western Greyhound Lines* (1963) 219 Cal.App.2d 342, 348 [33 Cal.Rptr. 184].) If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. (*Clemmer, supra,* 22 Cal.3d at pp. 877-878.) ■ When reviewing the validity of a judgment notwithstanding the verdict, an appellate court must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict. (*Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 515 [143 Cal.Rptr. 247, 573 P.2d 465].) In short, our duty is to apply the substantial evidence test to the jury verdict, "ignoring the judgment [n.o.v.]." (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)

■ Doctors Hospital asserts "there was no evidence that the acts or omissions of the hospital and its employees caused injury" and contends that as a matter of law the absence of expert testimony supports the trial court's granting of the motion. This contention is without merit, without support in the record or in law.

### II

The evidence is overwhelming that Czubinsky sustained catastrophic injuries as a direct result of the hospital personnel's failure to properly monitor and render aid when needed. Substantial evidence supports the jury's conclusion the hospital's (registered nurse Werner's and technician Harman's) acts and omissions were a proximate cause of Czubinsky's injuries:

1. Dr. Rand testified postoperative monitoring is critical. He stated monitoring "is absolutely important," and all personnel in the OR are required to observe the patient regardless of their job function. During the critical life endangered period Czubinsky's heart rate dropped from its normal beat of 70-80 per minute to 12-20 beats per minute. Dr. Rand testified the audio signal on the oscilloscope was always kept on and any significant change in the beep would be readily discernible.

Dr. Rand also said cardiopulmonary resuscitation (CPR), if administered properly, would provide adequate blood circulation and forestall permanent brain damage for as long as one-half hour; effective CPR required a joint effort by a number of people. Any significant change in cardiac activity necessitated prompt remedial measures. Any trained anesthesiologist, registered nurse or OR technician would have recognized this. Rand further testified it would have taken *several minutes with observable warning signs* present for Czubinsky to reach a severe hypoxic (brain damaging) condition.

2. Werner left the OR when Dr. Rand and Dr. Hoadie called her to come next door where they had started another surgery. Werner told the doctors she could not leave Czubinsky because she had not completed her duties, yet she departed. Werner concedes Czubinsky was at a critical postoperative period because she was undergoing the transition from anesthetized air to room air. Werner defends her leaving the room because she was "being yelled at."

3. The hospital's own manual of procedure sets forth specific duties of the circulating nurse in the OR. The manual provides, in pertinent part: "He/she is also the member of the team *who will be on hand to assist the Anesthesiologist during the entire procedure.*" (Italics added.)[1]

Werner was the circulating nurse assigned to the room occupied by Czubinsky. As a circulating nurse, Werner was in charge and responsible for assigning the two OR technicians to scrub. She would then circulate with them. Werner's other conceded responsibilities included monitoring the patient and assisting the anesthesiologist, Dr. Kushner. Werner was familiar with OR procedures and rules and was trained in CPR. The OR technician's (Harman's) presence in the room was not a substitute for Werner, the registered nurse.

4. Expert witness Dr. Lucas testified a cardiac arrest should be anticipated at any time in the OR and that appropriate modalities be ready to cope with it. He stated CPR correctly administered could be continued for one hour without permanent brain damage. He was of the opinion several qualified persons should stay with the patient postoperatively until the patient is delivered to the recovery room. Dr. Lucas agreed OR personnel should be qualified in patient monitoring; *vigilance in observing changes in patient's condition is paramount.* Finally, Dr. Lucas stated that short of an emergency it would be inappropriate for a surgeon to request a circulating nurse to leave a patient while in the OR. No emergency situation is shown in this record which would authorize Werner's departure.

---

[1]The manual also directs: To maintain satisfactory performance in the OR certain prescribed qualities are required, two of which are: "6. Ability to act promptly and efficiently under any circumstances—emergency or routine," and "7. *A willingness to uphold principles regardless of opposition from any source.*" (Italics added.)

5. Anesthesiologist Dr. Kushner testified.[2] He admitted the induction and postoperative periods were the most dangerous in the anesthesia procedure. He stated that after Czubinsky's problem was discovered he needed assistance with resuscitation, but because he was alone he had to run back and forth around the operating table alternating between CPR and ventilating her. Harman was gone for two or three minutes before he came back with help. Kushner further testified assistance was necessary during this critical period of time because *seconds count in a cardiac arrest such as this one.*

6. Harman, the OR technician, was trained as a hospital corpsman. He had extensive training in CPR and had been taught all personnel who were working in the OR were charged with the responsibility of monitoring and observing the patient. Harman had also been taught the period of time when the patient is coming off the respirator and is unable to breathe on his own is a most critical period.

Harman applied a dressing to Czubinsky, was cleaning up his back table and removing the surgical drapes covering Czubinsky when he noticed her legs were quite cool and her upper extremities were dark, blue and mottled. This indicated to him the patient was in distress. He asked Dr. Kushner if he needed assistance and then went to get help. Upon Harman's return to Czubinsky's room, he saw Dr. Kushner administering CPR with one hand draped over the hoop near the head of the operating table.

7. Finally, substantial evidence supports the damage award. Current medical bills of $179,785.93 were not disputed. Doctors Hospital asserted a bill against Czubinsky for $142,494. Uncontradicted expert testimony established home care for Czubinsky would be in excess of $60,000 per year; her life expectancy was a maximum of 12 years. Wage losses of $8,000 per year for 12 years were requested with no factor for inflation included. There were no estimates for future medical emergencies included in the figure. This evidence is substantial and more than sufficient to warrant the unanimous jury award.

From the foregoing evidence, the jury could rationally conclude it was the *entire staff's* duty to monitor a patient for postoperative complications. The registered nurse assigned to Czubinsky's OR had a duty to remain with her until she was transferred to the recovery room. The jury could properly conclude it was a breach of duty, negligence, for the nurse to leave the unconscious patient's side.

The nurse's absence from the OR was a patent, proximate, efficient cause of Czubinsky's injuries. She was the second most skilled person present. Her

---

[2]He had settled his lawsuit with Czubinsky by payment of $500,000.

presence and skill should have led to a *prompt* observation of the preliminary warning signs of vital function failures.

Had nurse Werner been present, she could have assisted the anesthesiologist with CPR while the OR technician went for help. Instead the anesthesiologist was left alone, in a hopeless ineffective attempt to resuscitate a patient in a rapidly deteriorating condition.

Failure of the hospital to provide adequate staff to assist the doctor in the immediate postoperative period was an act in dereliction of duty, a failure from which the result here—cardiac arrest and permanent brain damage—was a readily foreseeable result.

A jury could rationally conclude it was beneath the standard of care for the OR nurse to leave the patient for any period during this most critical time or for the technician to ignore the patient's vital signs while he cleaned up and inventoried his instruments.

■ No expert opinion is required to prove the hospital's failure to provide an adequate number of trained, qualified personnel at the most critical time in postoperative care was negligent. This neglecting, abandoning and ignoring the patient was a prime reason why effective CPR was unavailable and therefore an immediate, direct, and effective cause of Czubinsky's brain damage.

On such facts as a conceded abandonment—neglect in the purest sense—of a patient by nursing personnel at a life endangered time, no expert testimony is required either on the issue of neglect or causation. Want of care is so obvious as to render expert testimony unnecessary. (*Barham* v. *Widing* (1930) 210 Cal. 206, 216 [291 P. 173]; *Mastro* v. *Kennedy* (1943) 57 Cal.App.2d 499, 503 [134 P.2d 865]; *Stevenson* v. *Alta Bates, Inc.* (1937) 20 Cal.App.2d 303, 309 [66 P.2d 1265]; *Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1, 5 [172 P.2d 359].) Expert testimony here did in fact establish the standard of care, the approved practice, procedure and duties of OR nurses and technicians. The OR staff told of their specific actions at the time of the injury. The failure to follow that proper practice with ordinary care and diligence could be shown by nonexpert lay testimony. (*Jackson* v. *Mountain Sanitarium & Asheville Agr. Sch.* (1951) 234 N.C. 293 [67 S.E.2d 57, 62]; *Smithers* v. *Collins* (1981) 52 N.C.App. 255 [278 S.E.2d 286, 290]; *Spilotro* v. *Hugi* (1981) 93 Ill.App.3d 837 [417 N.E.2d 1066, 1070]; *Ohligschlager* v. *Proctor Community Hospital* (1973) 55 Ill.2d 411 [303 N.E.2d 392, 397]; *Johnson* v. *Vaughn* (Ky. 1963) 370 S.W.2d 591, 596-597; *Clapham* v. *Yanga* (1980) 102 Mich.App. 47 [300 N.W.2d 727, 731]; *Skeels* v. *Davidson* (1943) 18 Wn.2d 358 [139 P.2d 301, 304, 149 A.L.R. 225].) The jury is capable of determining whether the actual actions of the OR staff met the standard of care presented.

In such factual setting, granting the judgment notwithstanding the verdict was improper. Judgment reversed and the trial court is ordered to enter judgment for plaintiff conformable to the jury's verdict.

Brown (Gerald), P. J., and Work, J., concurred.

A petition for a rehearing was denied February 14, 1983, and respondent's petition for a hearing by the Supreme Court was denied April 13, 1983.