(No. 55733.—

DONNA COCKRUM *et al.*, Appellees, v. GEORGE BAUMGARTNER *et al.*, Appellants.—EDNA RAJA *et al.*, Appellees, v. A. TULSKY *et al.* (Michael Reese Hospital and Medical Center, Appellant).

*Opinion filed February 18, 1983.—Rehearing denied April 8, 1983.*

Hinshaw, Culbertson, Moelmann, Hoban & Fuller (Stanley J. Davidson, E. Michael Kelly, and Michael R. Goldman, of counsel), and Lord, Bissell & Brook (Harold L. Jacobson, Robert B. Austin, Paul A. Brady, and Hugh C. Griffin, of counsel), all of Chicago, for appellants.

Kenneth L. Cunniff, of Chicago, and Keith L. West, of Mundelein (Jean A. Hellman, of counsel), for appellees Donna and Leon Cockrum.

Ash, Anos, Freedman & Logan, and Addis & Brenner, Ltd., all of Chicago (Lawrence M. Freedman, Sheldon A. Brenner, and James L. Glass, Jr., of counsel), for appellees Edna and Afzal Raja.

JUSTICE WARD delivered the opinion of the court:

This appeal concerns the extent of the damages that may be recovered in a malpractice action based on a so-called "wrongful pregnancy" or "wrongful birth." The issue was raised in two medical malpractice suits that were consolidated on appeal from the circuit court of Cook County to the appellate court. In both cases, the plaintiffs had alleged that but for the negligence of the defendants each of the female plaintiffs would not have borne a child. In both actions, the plaintiffs sought to recover for the pain of childbirth, the time lost in having the child, and the medical expenses involved. The plaintiffs sought also to recover as damages the future expenses of raising the children, who, it would appear, are

healthy and normal. The circuit court dismissed the counts that set out the claims for the expenses of rearing the children. The plaintiffs appealed, and the appellate court reversed those judgments. (99 Ill. App. 3d 271.) We granted the defendants leave to appeal under Rule 315 (73 Ill. 2d R. 315).

Both suits were filed in the circuit court of Cook County. Cockrum v. Baumgartner was brought by Donna and Leon Cockrum against Dr. George Baumgartner and a laboratory that performed tests according to Dr. Baumgartner's instructions. The Cockrums alleged that Dr. Baumgartner negligently performed a vasectomy upon Leon Cockrum. Also, they claimed that he was negligent in telling them that a sperm test conducted by the laboratory showed no live sperm when he should have known that the laboratory report showed that the vasectomy had been medically unsuccessful. The Cockrums also alleged that after the attempted vasectomy Donna Cockrum became pregnant and gave birth to a child, and they claimed that she would not have become pregnant if the physician had not been negligent.

In Raja v. Tulsky, Edna and Afzal Raja brought an action against Dr. A. Tulsky and Michael Reese Hospital and Medical Center. The Rajas alleged that Dr. Tulsky negligently performed a bilateral tubal cauterization upon Edna Raja, which operation was designed to make her sterile. They alleged that about five years after the operation Edna Raja began to experience signs of pregnancy. She was examined at Michael Reese's gynecology clinic and advised, however, that she was not pregnant. Later, after the time in which the plaintiffs say it was medically safe to have an abortion, she learned that she was in fact pregnant. Edna Raja alleged that she suffers from hypertensive cardiac disease, and that she had been informed that it would be medically dangerous for her to have a child. The Rajas claim that Michael Reese was

negligent in failing to determine that she was pregnant. They say that if Michael Reese had told her that she was pregnant, she would have elected to terminate the pregnancy. Those counts in which Dr. Tulsky was named as a defendant were dismissed as barred by the statute of limitations and are not at issue here.

The Rajas and the Cockrums each gave birth to a child, and there is no indication that the children are other than normal and healthy. The only issue is whether the trial court erred in dismissing the counts in which the plaintiffs sought to recover as damages the future expenses of rearing the child.

As we have stated, the appellate court held that such expenses are recoverable. The members of the panel in the appellate court disagreed, however, in one respect. Two of the three judges believed that in determining damages the trier of fact should be permitted to consider the benefits the plaintiffs receive from the parent-child relationship. (99 Ill. App. 3d 271, 275-77 (Linn, J., specially concurring), 277 (Romiti, P.J., specially concurring).) The third member of the court, on the other hand, considered that such an offset would be improper. 99 Ill. App. 3d 271, 274.

The courts in the majority of States that have considered "wrongful pregnancy" or "wrongful birth" actions have recognized a cause of action against a physician where it is alleged that because of the doctor's negligence the plaintiff conceived or gave birth. (See Annot., *Tort Liability for Wrongfully Causing One to be Born*, 83 A.L.R.3d 15, 29 (1978).) These courts have generally held that in such actions the infant's parents may recover for the expenses of the unsuccessful operation, the pain and suffering involved, any medical complications caused by the pregnancy, the costs of delivery, lost wages, and loss of consortium. (83 A.L.R.3d 15, 29-30.) There is sharp disagreement, however, on the question

involved here: whether plaintiffs may recover as damages the costs of rearing a healthy child.

There are courts which have allowed the recovery of the cost of rearing a child on the ground that such expense is a foreseeable consequence of the negligence. Those courts also have held that this recovery may be offset, however, by an amount representing the benefits received by the parents from the parent-child relationship. See *Stills v. Gratton* (1976), 55 Cal. App. 3d 698, 127 Cal. Rptr. 652; *Ochs v. Borrelli* (1982), 187 Conn. 253, 445 A.2d 883; *Pierce v. DeGracia* (1982), 103 Ill. App. 3d 511; *Troppi v. Scarf* (1971), 31 Mich. App. 240, 187 N.W.2d 511; *Sherlock v. Stillwater Clinic* (Minn. 1977), 260 N.W.2d 169; *Mason v. Western Pennsylvania Hospital* (1981), 286 Pa. Super. 354, 428 A.2d 1366.

In a substantially greater number of jurisdictions, however, courts have denied recovery in suits for costs of rearing a child. See *McNeal v. United States* (4th Cir. 1982), 689 F.2d 1200 (interpreting Virginia law); *White v. United States* (D. Kan. 1981), 510 F. Supp. 146 (interpreting Georgia law); *Boone v. Mullendore* (Ala. 1982), 416 So. 2d 718; *Wilbur v. Kerr* (1982), 275 Ark. 239, 628 S.W.2d 568; *Coleman v. Garrison* (Del. 1975), 349 A.2d 8; *Public Health Trust v. Brown* (Fla. App. 1980), 388 So. 2d 1084; *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51; *Maggard v. McKelvey* (Ky. Ct. App. 1981), 627 S.W.2d 44; *Kingsbury v. Smith* (1982), 122 N.H. 237, 442 A.2d 1003; *P. v. Portadin* (1981), 179 N.J. Super. 465, 432 A.2d 556; *Sorkin v. Lee* (1980), 78 A.D.2d 180, 434 N.Y.S.2d 300; *Terrell v. Garcia* (Tex. Civ. App. 1973), 496 S.W.2d 124, *cert. denied* (1974), 415 U.S. 927, 39 L. Ed. 2d 484, 94 S. Ct. 1434; *Rieck v. Medical Protective Co.* (1974), 64 Wis. 2d 514, 219 N.W.2d 242; *Beardsley v. Wierdsma* (Wyo. 1982), 650 P.2d 288; see also *Ball v. Mudge* (1964), 64 Wash. 2d 247, 391 P.2d 201.

Some of these courts have pointed to the speculative nature of the damages. (*E.g., Sorkin v. Lee* (1980), 78 A.D.2d 180, 434 N.Y.S.2d 300.) Others have expressed concern for the child who will learn that his existence was unwanted and that his parents sued to have the person who made his existence possible provide for his support. (*E.g., Wilbur v. Kerr* (1982), 275 Ark. 239, 628 S.W.2d 568.) Some courts have decided that requiring the payment of rearing costs would impose an unreasonable burden upon a defendant, unreasonable because it would permit the plaintiffs to enjoy the benefits of parenthood, while shifting all of the expenses to the defendant. That burden, the courts say, is out of proportion to the fault involved. (*E.g., White v. United States* (D. Kan. 1981), 510 F. Supp. 146; *Kingsbury v. Smith* (1982), 122 N.H. 237, 442 A.2d 1003.) Courts have also stated that allowing such damages would open the door to various false claims and fraud. *E.g., Rieck v. Medical Protective Co.* (1974), 64 Wis. 2d 514, 219 N.W.2d 242; *Beardsley v. Wierdsma* (Wyo. 1982), 650 P.2d 288.

Too, many courts have declared an unwillingness to hold that the birth of a normal healthy child can be judged to be an injury to the parents. That a child can be considered an injury offends fundamental values attached to human life. This was expressed with some sentimentality in *Public Health Trust v. Brown* (Fla. App. 1980), 388 So. 2d 1084. The court, in denying recovery of rearing costs to a woman who alleged that she had became pregnant after a negligently performed tubal ligation, said:

> "In holding that such a claim should not be recognized, we align ourselves with a clear majority of courts in other jurisdictions which have decided the identical question [citations].
>
> There is no purpose to restating here the panoply of reasons which have been assigned by the courts which follow the majority rule. *** In our view, however, its ba-

sic soundness lies in the simple proposition that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child. Even the courts in the minority recognize, as the jury was instructed in this case, that the costs of providing for a child must be offset by the benefits supplied by his very existence. [Citations.] But it is a matter of universally-shared emotion and sentiment that the intangible but all-important, incalculable but invaluable 'benefits' of parenthood far outweigh any of the mere monetary burdens involved. [Citations.] Speaking legally, this may be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the 'unwanted' child for adoption. [Citations.] On a more practical level, the validity of the principle may be tested simply by asking any parent the purchase price for that particular youngster. Since this is the rule of experience, it should be, and we therefore hold that it is, the appropriate rule of law. It is a rare but happy instance in which a specific judicial decision can be based solely upon a reflection of one of the humane ideals which form the foundation of our entire legal system. This, we believe, is just such a case." 388 So. 2d 1084, 1085-86.

*Beardsley v. Wierdsma* (Wyo. 1982), 650 P.2d 288, is another decision in which the court refused to permit the recovery of rearing costs. In rejecting the notion that would allow the recovery of rearing costs with an offset for the benefits of parenthood, it was observed:

"We believe that the benefits of the birth of a healthy, normal child outweigh the expense of rearing a child. The bond of affection between child and parent, the pride in a child's achievement, and the comfort, counsel and society of a child are incalculable benefits, which should not be measured by some misplaced attempt to put a specific dollar value on a child's life.

The benefit or offset concept smacks of condemnation law, where the trier of fact determines the value of the land taken by the condemnor. The trier of fact then determines the benefit that results to the land owner, which benefit is deducted from the original value to de-

termine the proper award. If the concept of benefit or offset was applied to 'wrongful birth' actions, we can conceive of the ridiculous result that benefits could be greater than damages, in which event someone could argue that the parents would owe something to the tortfeasors. We think that a child should not be viewed as a piece of property, with fact finders first assessing the expense and damage incurred because of a child's life, then deducting the value of that child's life." 650 P.2d 288, 293.

Similarly, in *Terrell v. Garcia* (Tex. Civ. App. 1973), 496 S.W.2d 124, 128, *cert. denied* (1974), 415 U.S. 927, 39 L. Ed. 2d 484, 94 S. Ct. 1434, the court, not without emotion, reasoned:

"[A] strong case can be made that, at least in an urban society, the rearing of a child would not be a profitable undertaking if considered from the economics alone. Nevertheless, as recognized in [*Hayes v. Hall* (Tex. Civ. App. 1972), 477 S.W.2d 402, *rev'd* (Tex. 1972), 488 S.W.2d 412] and [*Troppi v. Scarf* (1971), 31 Mich. App. 240, 187 N.W.2d 511], the satisfaction, joy and companionship which normal parents have in rearing a child make such economic loss worthwhile. These intangible benefits, while impossible to value in dollars and cents are undoubtedly the things that make life worthwhile. Who can place a price tag on a child's smile or the parental pride in a child's achievement? Even if we consider only the economic point of view, a child is some security for the parents' old age. Rather than attempt to value these intangible benefits, our courts have simply determined that public sentiment recognizes that these benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal chid. We see no compelling reason to change such rule at this time." 496 S.W.2d 124, 128.

We consider that on the grounds described the holding of a majority of jurisdictions that the costs of rearing a normal and healthy child cannot be recovered as damages to the parents is to be preferred. One can, of course, in mechanical logic reach a different conclusion, but only on

the ground that human life and the state of parenthood are compensable losses. In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are at the heart of our legal system and, broader still, our civilization.

In *Wilczynski v. Goodman* (1979), 73 Ill. App. 3d 51, our appellate court held that a mother could not recover the expenses of rearing a healthy child in an action that charged a physician with negligence in performing an abortion. The court, referring to legislation regarding abortion, observed that it is the policy of this State to protect human life. The court declared:

> "In our judgment, a public policy which deems precious even potential life while yet in the womb, at such cost and expense that condition may entail, does not countenance as compensable damage to its parent or parents those additional costs and expenses necessary to sustain and nurture that life once it comes to fruition upon and after successful birth. The existence of a normal, healthy life is an esteemed right under our laws, rather than a compensable wrong." 73 Ill. App. 3d 51, 62.

The reasoning of the court is applicable where an action is brought for a negligent sterilization or a negligent failure to determine pregnancy.

We would observe, too, that it is clear that public policy commands the development and the preservation of family relations. Exemplary of that policy in the tort context is the rule prohibiting suits by children against their parents for negligence. (*Thomas v. Chicago Board of Education* (1979), 77 Ill. 2d 165, 171.) To permit parents in effect to transfer the costs of rearing a child would run counter to that policy. As stated earlier, those jurisdictions that permit a recovery for rearing costs have recognized that the recovery should be offset by the measure by which the plaintiffs have been benefited by becoming parents. Two judges of the appellate court panel here appear to favor this view.

It can be seen that permitting recovery then requires that the parents demonstrate not only that they did not want the child but that the child has been of minimal value or benefit to them. They will have to show that the child remains an uncherished, unwanted burden so as to minimize the offset to which the defendant is entitled. The court in *Public Health Trust v. Brown* (Fla. App. 1980), 388 So. 2d 1084, 1086 n.4, convincingly noted: "The adoption of that rule [allowing recovery] would thus engender the unseemly spectacle of parents disparaging the 'value' of their children or the degree of their affection for them in open court. It is obvious, whether the conclusion is phrased in terms of 'public policy,' [citation] or otherwise, that such a result cannot be countenanced."

We do not perceive the relevance here of *Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678, and *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, cited by the plaintiffs. In *Griswold* the court invalidated a statute making the use of contraceptives an offense. The court deemed that by outlawing the use of contraceptives the State unnecessarily invaded marital privacy. In *Roe*, the court held that a woman's right to privacy is violated by a statute that prohibits all abortions that are not necessary to preserve the mother's life.

The decisions appear irrelevant to the issue of whether damages may be recovered under the circumstances here for expenses after the birth of the child. The plaintiffs refer to these decisions in opposing considerations of public policy argued by the defendants and relied upon by some of the decisions we have cited. We would note that the plaintiffs themselves, as we shall show, rely upon public policy.

We cannot on balance accept the plaintiffs' contention too that we should rigidly and unemotionally, as they put it, apply the tort concept that a tortfeasor should be liable

for all of the costs he has brought upon the plaintiffs. It has been perceptively observed, by distinguished authority, that the life of the law is not logic but experience. Reasonableness is an indispensable quality in the administration of justice. The New York Court of Appeals, in rejecting a claim made in very different context, used language, however, that is not without appropriateness here:

"While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." (*Tobin v. Grossman* (1969), 24 N.Y.2d 609, 619, 249 N.E.2d 419, 424, 301 N.Y.S.2d 554, 561.)

The reasons given for denying so-called rearing costs are more convincing than the reasons for abstractly applying a rule not suited for the circumstances in this character of case.

As we have noted, the plaintiffs themselves also rely upon considerations of public policy to temper the harshness of a proposed mechanical application of a principle of damages. In general, under the law of damages a plaintiff cannot recover for elements of damage he could reasonably have avoided. (D. Dobbs, Remedies sec. 8.9, at 579 (1973).) It has been said that this avoidable consequences rule might prevent recovery for rearing costs where the parents had an opportunity to avoid parenthood through abortion or adoption. (See *Robak v. United States* (7th Cir. 1981), 658 F.2d 471, 479 n.23 (the court stated that physicians in negligent-sterilization cases should not be liable for the costs of rearing a normal child where the plaintiffs learned of the pregnancy within the first trimester and freely chose not to terminate the pregnancy); *Sorkin v. Lee* (1980), 78 A.D.2d 180, 434 N.Y.S.2d 300 (the court held that the plaintiffs, suing for a negligently performed vasectomy, could not recover rearing costs, as they did not claim

that the physician's negligence prevented them from terminating the pregnancy or that abortion would have been medically dangerous for the mother); *Rieck v. Medical Protective Co.* (1974), 64 Wis. 2d 514, 219 N.W.2d 242 (it was contended that plaintiffs should be required to minimize their damages by taking steps to terminate their parental rights).) In contending that the avoidable-consequences rule should not be applied, it was argued for the plaintiffs in oral argument that applying the rule here would violate a policy, based on natural appreciation and affection, which favors the rearing of children by their natural parents.

The area of law we consider here is new, but there is reason to believe this question and related issues will be presented with increasing frequency. As the decisions we have cited show, courts regard the questions as matters of high social importance, transcending the individual controversies involved.

Dean Prosser recognized that considerations of public policy are of great importance in the law of torts. He commented:

"Perhaps more than any other branch of the law, the law of torts is a battleground of social theory. Its primary purpose, of course, is to make a fair adjustment of the conflicting claims of the litigating parties. But the twentieth century has brought an increasing realization of the fact that the interests of society in general may be involved in disputes in which the parties are private litigants. The notion of 'public policy' involved in private cases is not by any means new to tort law, and doubtless has been with us ever since the troops of the sovereign first intervened in a brawl to keep the peace; but it is only in recent decades that it has played a predominant part. Society has some concern even with the single dispute involved in a particular case; but far more important than this is the system of precedent on which the entire common law is based, under which a rule once laid down is to be followed until the courts find good reason to depart from it, so that others now living and even those yet

unborn may be affected by a decision made today. There is good reason, therefore, to make a conscious effort to direct the law along lines which will achieve a desirable social result, both for the present and for the future." Prosser, Torts sec. 3, at 14-15 (4th ed. 1971).

For the reasons given, the judgment of the appellate court is reversed and the judgments of the circuit court are affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE CLARK, dissenting:

This court today has come to the conclusion that child-rearing costs are not recoverable in a wrongful birth action in Illinois. The court relies primarily on what it sees as a necessary public policy posture in reaching the conclusion it does. However, I believe the court's opinion is internally inconsistent, and I feel that, upon a careful examination, it mischaracterizes the issues without any substantive legal foundation upon which to build. The court inconsistently has said that the birth of a normal child cannot be judged to be an injury to parents and yet, at the beginning of the opinion, the court recognizes that a cause of action exists for wrongful birth in this State, and that plaintiffs can recover for the pain of childbirth, the time lost in having the child, and the medical expenses incurred. The court in effect has found that the birth of a normal child is recognized as an injury in "wrongful birth actions" in Illinois; the issue is what damages are recoverable as a result of that injury to the parents. If, as the court hypothesizes, the birth of a normal child cannot be construed as an injury, how then can the plaintiff recover for the "pain" of childbirth? Should, then, the court characterize the time "lost in having the child" as "lost" time (which in effect is found to be compensable)? Why then allow for the medical costs of childbirth if they represent the first installment in an investment in the preservation and development of family re-

lations? The opinion of the court contradicts itself. Once the court has agreed that the cause of action for wrongful birth can be brought in Illinois, the policy questions that the opinion grapples with are moot.

The court determines that while other jurisdictions have applied "mechanical logic" in reaching a different conclusion than this court does, such a result can only be reached "on the ground that human life and the state of parenthood are compensable losses." (95 Ill. 2d at 200-01.) Are we then to assume that the courts in Pennsylvania (*Mason v. Western Pennsylvania Hospital* (1981), 286 Pa. Super. 354, 428 A.2d 1366), Connecticut (*Ochs v. Borrelli* (1982), 187 Conn. 253, 445 A.2d 883), Minnesota (*Sherlock v. Stillwater Clinic* (Minn. 1977), 260 N.W.2d 169), and California (*Stills v. Gratton* (1976), 55 Cal. App. 3d 698, 127 Cal. Rptr. 652), as well as the appellate courts of Michigan (*Troppi v. Scarf* (1971), 31 Mich. App. 240, 187 N.W.2d 511), and of this State (*Cockrum v. Baumgartner* (1981), 99 Ill. App. 3d 271, *Pierce v. DeGracia* (1982), 103 Ill. App. 3d 511) do not respect human life, because those courts find the foreseeable child-rearing expenses to be recoverable in a wrongful birth action? I believe the court has mischaracterized the issue in a most unfortunate and hyperbolic way. It is not at all that human life or the state of parenthood are inherently injurious; rather it is an unplanned parenthood and an unwanted birth, the cause of which is directly attributable to a physician's negligence, for which the plaintiffs seek compensation.

*Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678, and *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, established that the right to limit procreation was a constitutionally protected right. The United States Supreme Court did not perceive any threat to the sanctity of life by recognizing that a married couple has the right to choose not to procreate. To deny child-rearing expenses effectively nullifies that right

by severely impairing the remedy available to parents who, after choosing not to conceive a child, have found that due to a negligently performed vasectomy they are going to be parents. A couple's decision not to have a child does not undermine the value of a human life. In allowing recovery for damages for child-rearing expenses, we would only be compensating parents for damages that naturally flow from the commission of the tortious act which this court has now recognized.

Nor should the parents be forced to mitigate damages by choosing abortion or adoption. They chose not to conceive a child. It is quite a different situation to ask a couple, once a child has been conceived, to abort, or to put the child up for adoption, indicating that if they failed to do either they would assume full responsibility of any and all costs of that child. If parents are confronted in such a situation with choices that they consider to be unenviable alternatives, they should not be precluded from recovering damages because they select the most desirable of these unpalatable choices. Kelley, *Wrongful Life, Wrongful Birth, and Justice in Tort Law,* 1979 Wash. U.L.Q. 919, 950; see, *e.g., Troppi v. Scarf* (1971), 31 Mich. App. 240, 187 N.W.2d 511; *Clapham v. Yanga* (1980), 102 Mich. App. 47, 300 N.W.2d 727; *Sorkin v. Lee* (1980), 78 A.D.2d 180, 434 N.Y.S.2d 300.

Once a breach of duty by a physician has been established, that tortfeasor must bear the responsibility for the consequences of that action. See *Sherlock v. Stillwater Clinic* (Minn. 1977), 260 N.W.2d 169.

It is certainly foreseeable that a physician's failure to properly perform a vasectomy on a husband or failure to properly perform a bilateral tubal cauterization on a wife, would result in the woman's giving birth to an unplanned child. It is also foreseeable that the parents would incur substantial expenses in raising and educating that child.

The court has reached the same result arrived at in the

Florida case of *Public Health Trust v. Brown* (Fla. App. 1980), 388 So. 2d 1084. The court quotes with approval from that Florida appellate court opinion, where it was said: "[I]t is a matter of universally-shared emotion and sentiment that the intangible but all important, incalculable but invaluable 'benefits' of parenthood far outweigh any of the mere monetary burdens involved." 388 So. 2d 1084, 1085-86.

I feel such an assertion flies in face of the widespread use of contraceptives today. The court in *Troppi v. Scarf* (1971), 31 Mich. App. 240, 253, 187 N.W.2d 511, 517, realized that contraceptives "are used to prevent the birth of healthy children." That appellate court in Michigan also recognized that "[t]o say that for reasons of public policy contraceptive failure can result in no damage as a matter of law ignores the fact that tens of millions of persons use contraceptives daily to avoid the very result which the defendant would have us say is always a benefit, never a detriment. Those tens of millions of persons, by their conduct, express the sense of the community." (31 Mich. App. 240, 253, 187 N.W.2d 511, 517.) I believe that it is fair to say that many prospective parents use birth-control measures in deliberately attempting to avoid the expense of raising a child, because to many of them, at that point in time, the financial costs of feeding, clothing, sheltering and educating a child are prohibitive.

Certainly there are positive aspects to child rearing and enduring benefits to parenthood, but that does not mean, to me, that parents who take measures to prevent the conception of a child should be burdened with all of the expenses that go along with raising that child—expenses that they would not have incurred had it not been for the negligence of another.

I would also follow those other jurisdictions where child-rearing costs, while recoverable, are offset to a certain degree by the benefits of parenthood. (See *Troppi v. Scarf*

(1971), 31 Mich. App. 240, 187 N.W.2d 511, *Sherlock v. Stillwater Clinic* (Minn. 1977), 260 N.W.2d 169.) Potential benefits, including companionship, that the parents may derive from that parent-child relationship should be considered by the trier of fact in determining the ultimate amount of damages. I do not believe that the many benefits of having a child should be excluded as a matter of law; nor do I feel that such benefits can be held to automatically offset all expenses. Plaintiffs who choose to rear this unplanned child should be allowed to recover for damages according to the degree of the injury. That will inevitably vary. I agree with what the court in *Troppi v. Scarf* (1971), 31 Mich. App. 240, 257, 187 N.W.2d 511, 519, said:

> "The essential point, of course, is that the trier must have the power to evaluate the benefit according to all the circumstances of the case presented. Family size, family income, age of the parents, and marital status are some, but not all, the factors which the trier must consider in determining the extent to which the birth of a particular child represents a benefit to his parents. That the benefits so conferred and calculated will vary widely from case to case is inevitable."

The Restatement (Second) of Torts indicates that if damages are to be reduced, the benefit conferred must be to the interest that was harmed:

> "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." (Restatement (Second) of Torts sec. 920, at 509 (1979).)

Thus the trier of fact can be in a more flexible position in determining what is the most equitable award. Application of the so-called "special benefits" rule is appropriate here, for as one commentator stated:

> "Rigid categorization of interests is unnecessary and especially inappropriate in the wrongful birth context in

which plaintiffs' reasons for limiting family size are often multifaceted and complex.

\* \* \*

\*\*\* [While] [t]he process would be admittedly difficult for the judge to administer and would require the trier of fact to exercise utmost diligence in balancing benefits and burdens, [it is only through the balancing process that the court] insure[s] that damages are measured as accurately as possible." Note, Tort Damages—Wrongful Birth, 1982 So. Ill. U.L.J. 111, 133-35.

While such a computation in offsetting the benefits that accrue to the parents against the expenses to be incurred is difficult, it is no more formidable a task than determining the amount of damages to be awarded for loss of consortium in a wrongful death action. See *Elliott v. Willis* (1982), 92 Ill. 2d 530, 540.

In reaching the result arrived at today, I believe the court has taken a myopic view of prospective parents' considerations. A couple privileged to be bringing home the combined income of a dual professional household may well be able to sustain and cherish an unexpected child. But I am not sure the child's smile would be the most memorable characteristic to an indigent couple, where the husband underwent a vasectomy or the wife underwent a sterilization procedure, not because they did not desire a child, but rather because they faced the stark realization that they could not afford to feed an additional person, much less clothe, educate and support a child when that couple had trouble supporting one another. The choice is not always giving up personal amenities in order to buy a gift for the baby; the choice may only be to stretch necessities beyond the breaking point to provide for a child that the couple had purposely set out to avoid having. The court today expresses concern about putting a negative imprimatur on a child's life and yet, in denying damages for child rearing, the court may well be accomplishing the very result it so seems intent on avoiding—making a child of an unwanted

birth a victim of a very real continuing financial struggle and thus a painful reminder of the obligations of parenthood to a couple who had no appetite for a parental life-style. Does that child then become more wanted because this court has seen fit to deny foreseeable expenses in a case where a physician's negligence is undisputed?

JUSTICE SIMON joins in this dissent.